# 12-2807-cv

**(Related Case No. 12-2786-cv)**

# United States Court of Appeals

*for the*

# Second Circuit

AMERICAN BROADCASTING COMPANIES, INC., DISNEY
ENTERPRISES, INC., CBS BROADCASTING INC., CBS STUDIOS INC.,
NBCUNIVERSAL MEDIA, LLC, NBC STUDIOS, LLC, UNIVERSAL
NETWORK TELEVISION, LLC, TELEMUNDO NETWORK GROUP LLC
and WNJU-TV BROADCASTING LLC,

*Plaintiffs-Counter-Defendants-Appellants*,

– v. –

AEREO, INC.,

*Defendant-Counter-Claimant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PETITION FOR REHEARING
## WITH SUGGESTION FOR REHEARING *EN BANC*

BRUCE P. KELLER
JEFFREY P. CUNARD
MICHAEL R. POTENZA
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Plaintiffs-Counter-Defendants-Appellants*

## **<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

PRELIMINARY STATEMENT ....................................................................1

ARGUMENT ..........................................................................................5

    I.    The Majority Opinion Threatens The Over-The-Air Broadcasting Industry And Ignores Unequivocal Congressional Intent. ................................... 5

    II.    The Majority Conflicts With Prior Decisions. .................................... 10

CONCLUSION ......................................................................................15

# TABLE OF AUTHORITIES

CASES

*United States v. Am. Soc'y of Composers,* 627 F.3d 64 (2d Cir. 2010)............10, 13

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ......................................................................................*passim*

*CBS Broad., Inc. v. FilmOn.com, Inc.*, No. 10-cv-07532 (S.D.N.Y. Nov. 22, 2010) ...................................................................................12

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984) ...............................................................................................9

*Fortnightly Corp. v. United Artists Television*, 392 U.S. 390 (1968) .................6, 7

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, No. CV 12-6921-GW(JCx), 2012 WL 6784498 (C.D. Cal. Dec. 27, 2012)........................13

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998)...........................13

*Live Nation Motor Sports, Inc. v. Davis*, No. 3:06-CV-276-L, 2007 WL 79311 (N.D. Tex. Jan. 9, 2007) ........................................................12

*NFL v. PrimeTime 24*, 211 F.3d 10 (2d Cir. 2000) .................................................13

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394 (1974) ...............6

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321 (D.N.J. 2002)...........................................................................12

*Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal. Aug. 1, 2011)...........................................................................12

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 279 (2d Cir. 2012)...............................*passim*

STATUTES AND RULES

17 U.S.C. § 101 ..........................................................................................*passim*

Fed. R. App. P. 35(a) .....................................................................................3, 4, 15

**OTHER AUTHORITIES**

2 PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 7.7.2, at 7:168 (3d ed. 2012 supp.) ..........................................................................................8

H.R. REP. NO. 1476, 94th Cong., 2d Sess. (1975) ............................................1, 7, 8

Jane C. Ginsburg, *Recent Developments in U.S. Copyright Law*, REVUE INTERNATIONALE DU DROIT D'AUTEUR (2009)....................................................8

## PRELIMINARY STATEMENT

When Congress enacted the Copyright Act of 1976 ("Copyright Act"), it intended, once and for all, to make clear that businesses retransmitting television broadcast signals cannot do so without authorization.  Anticipating every form of future technology, it enacted the Transmit Clause to outlaw unauthorized retransmissions to the public, by "***any device or process***," whether made by cable systems, satellite carriers or other platforms "not yet in use or even invented."  17 U.S.C. § 101 (the "Transmit Clause") (emphasis added); H.R. REP. NO. 1476, 94th Cong., 2d Sess. (1975), at 63-64 ("House Report").  As a result, the Transmit Clause expressly prohibits such transmissions, regardless of whether the members of the public receiving the retransmitted performance are "in the same place or in separate places," or receive it at "the same time or at different times."  17 U.S.C. § 101.

The Majority Opinion,[1] however, held that broad language actually does not prohibit all unauthorized broadcast retransmission services.  It held that Aereo, Inc. ("Aereo") may take the Super Bowl or other television broadcasts, instantly make thousands of copies of those programs and retransmit them over the Internet "live" to Aereo's paying subscribers, all without any authorization by, or payment to,

---

[1]    Circuit Judge Droney wrote the Majority Opinion, joined by Judge John Gleeson, U.S.D.J., sitting by designation.  Circuit Judge Chin dissented.

copyright owners.  The Majority concluded that Aereo's unauthorized commercial retransmissions are lawful even though Aereo does just what Congress proscribed in the Transmit Clause and "precisely what cable companies, satellite television companies, and authorized Internet streaming companies do."  *See* Dissent at 4; Maj. Op. at 23.

The Majority concluded that "guideposts" it derived from *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), compelled that counterintuitive result and created a way to circumvent the Transmit Clause.  Maj. Op. at 22.  Rather than evaluating Aereo's unauthorized retransmission service under the express language of the Transmit Clause, as it should have done, the Majority concluded it was bound to a mechanical application of the *Cablevision* analysis.  That analysis, however, had been developed for and applied to a very different form of television distribution – a remote DVR storage system intentionally designed to preclude the types of simultaneous retransmissions at the core of the Transmit Clause.

The Majority overlooked the nature of Aereo's business – a commercial enterprise that sells subscriptions to a broadcast television retransmission service – and instead focused entirely on the means by which Aereo accomplishes that end.  Maj. Op. at 22-23.  As a result, any business that uses subscriber-associated copies

2

(and maybe individual antennae) to retransmit broadcasts – no matter how instantaneous the retransmissions and no matter how many subscribers receive them at the same time – now escapes liability under the Majority's holding. Maj. Op. at 23, 33-34.

Judge Chin's Dissent recognizes the Majority Opinion is not consistent either "with the Copyright Act, its legislative history, [or Second Circuit] case law." Dissent at 4; *id.* at 2-3 ("Aereo's theory" that "it may retransmit . . . the Super Bowl 'live' to 50,000 subscribers . . . because each subscriber has an individual antenna and a 'unique recorded copy,'" "[o]f course . . . makes no sense"). It correctly notes that Aereo's temporary, individual copies, unlike the stored copies in *Cablevision*, function as a pass-through to enable Aereo to retransmit broadcast programs simultaneously to the public while evading the Transmit Clause. The Dissent correctly labeled them a "sham," designed to evade the Transmit Clause. *Id.* at 2.

The magnitude of the Majority's error creates an issue "of exceptional importance" under Fed. R. App. P. 35(a)(2), because it provides a "blueprint . . . to avoid the Copyright Act's licensing regime." Dissent at 26 It effectively creates a judicial exception to the Transmit Clause. It upends decades of settled expectations in the broadcasting industry, based upon a statutory scheme that

3

Congress carefully designed to foreclose the possibility that new and unforeseen technologies would erode the value of the exclusive rights accorded broadcast copyright owners. Unless corrected, it will have immediate and profound consequences for those that rely on the public performance right.[2] The expansion of *Cablevision* to reach "circumstances far beyond those [it] presented" now "undermine[s] copyright protection" in exactly the ways then-Solicitor General Kagan cautioned against when responding to the Supreme Court's request for views on whether to grant *certiorari* in that case. *See* Amicus Br. of the United States at 20-21, *Cable News Network, Inc. v. CSC Holdings, Inc.*, 129 S. Ct. 2890 (2009) ("Amicus Brief").

Review of the Majority Opinion also is appropriate to "secure or maintain uniformity of the court's decisions." Fed. R. App. P. 35(a)(1). The starting point for copyright cases is the text of the Copyright Act. *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 279 (2d Cir. 2012) (proper analysis looks first to statute, then to congressional intent). The Majority departed from that mandate. Instead, it mistakenly concluded that the *Cablevision* analysis, and not the statutory text,

---

[2]   This is underscored by the amicus briefs urging reversal filed by the former Register of Copyrights of the United States, Dkt. 114, the broadcast industry, Dkt.103, the motion picture industry, Dkt. 108, the music industry, Dkt. 113, the major professional sports leagues, Dkt. 101, and even Cablevision Systems Corp. (the defendant in *Cablevision*), Dkt. 110, as well as in the widespread media accounts of the Majority's decision and its impact. *See* n.3, *infra*.

4

controlled. *See* Maj. Op. at 22, 33. Neither *Cablevision* nor any other case, however, supports an approach that not only ignores the statutory language but also so obviously conflicts with congressional intent. *See* Dissent at 14 ("Congress could not have intended for [Aereo's] system to fall outside the definition of a public performance").

This Court should take this critical opportunity to clarify that the Transmit Clause covers all retransmission services, even those that use subscriber-associated copies. If, instead, the Court concludes that *Cablevision* dictates the Majority's result, it should revisit *Cablevision*'s reading of the Transmit Clause.

## **ARGUMENT**

### I. **The Majority Opinion Threatens The Over-The-Air Broadcasting Industry And Ignores Unequivocal Congressional Intent.**

Because Aereo is in the exact same business as other cable, satellite and Internet retransmitters, its unauthorized misappropriation of broadcasters' programs will cause the very harms Congress sought to prevent and that this Court expressly recognized in *ivi*:

> The strength of [broadcasters'] negotiating platform and business model . . . [t]he quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules – all would be adversely affected. . . . Continued live retransmissions of copyrighted television programming . . . without consent would thus threaten to destabilize the entire industry.

5

*ivi*, 691 F.3d at 286.[3]  These harms affect not just Petitioners, but other copyright owners that also rely on the public performance right.  *ivi*, 691 F.3d at 286 ("harms would extend to other copyright holders of television programming"); *see*, *e.g.*, Brief of *Amici Curiae* National Basketball Ass'n *et al.*, Dkt. 123, at 5 ("all content owners would have increasingly less incentive to place their programming on free over-the-air broadcast television"); Brief of the National Ass'n of Broadcasters, *et al.*, Dkt. 122, at 2 (Aereo undermines "broadcasters' ability to create new innovative programming . . . original local news and community affairs programming").

Congress intended to eliminate those risks when it enacted the Transmit Clause.  It did so with the unusual purpose of overturning two Supreme Court decisions.  In *Fortnightly Corp. v. United Artists Television*, 392 U.S. 390 (1968), and *Teleprompter Corp. v. Columbia Broadcasting Systems, Inc.*, 415 U.S. 394 (1974), the Supreme Court had held, under the prior Copyright Act, that cable

---

[3]   *See also* Brian Stelter, *TV Circling The Wagons Over Aereo*, NEW YORK TIMES (April 10, 2013) ("Aereo's success in court could embolden cable and satellite providers to do their own end-run"); Liana B. Baker & Ronald Grover, *Tech Upstarts Threaten TV Broadcast Model*, REUTERS (April 7, 2013) (Aereo "could force" broadcasters to "trade in their broadcast towers and become cable channels"); Jeff Bercovici, *Aereo v. The Networks:  Is It All Over But The Crying*? FORBES, April 2, 2013 (Aereo will "crippl[e the broadcasters] in their negotiations with cable and satellite systems"); Ryan Davis, *Fallout From Aereo Ruling to Pit Networks Against Cable Cos.*, LAW360 (April 1, 2013) ("economic ramifications cannot be understated").

systems could "retransmit broadcast television programming without obtaining licenses or incurring any fees" because their "retransmissions were not performances." *ivi*, 691 F.3d at 281. Those decisions reasoned that cable systems "[e]ssentially" did "no more than enhance[] the viewer's capacity to receive the broadcaster's signals" by "provid[ing] a well-located antenna." 392 U.S. at 399; *compare* Maj. Op. at 6 ("Aereo functions much like a television with a remote [DVR] and Slingbox").

In the Transmit Clause, Congress deliberately rejected that rationale. It was drafted to foreclose new retransmission businesses from arguing either that they only do what viewers can do themselves or that their unauthorized broadcast retransmissions to multiple subscribers were something other than "public performances" based on the transmission media or technologies used. As a result, the Transmit Clause is "broad enough to include . . . each and every method by which the images or sounds comprising a performance or display are picked up and conveyed." House Report at 63-64; *see also id.* at 64 (Transmit Clause "include[s] *all conceivable forms . . . of wires and wireless communications media*" (emphasis added)).

The only distinctions between Aereo and other infringing retransmitters are the thousands of mini-antennae used by Aereo and the technologically superfluous

7

subscriber-associated copies Aereo inserts into the retransmission path.  Maj. Op.

23, 32-33.  Congress, however, made clear that the method, technique or system

used cannot matter; all are covered by the sweeping "any device or process"

language of the Transmit Clause.  House Report at 64 (Transmit Clause covers

"other techniques and systems not yet in use or even invented.").  Under the

Transmit Clause, liability cannot turn on the number of copies used by an infringer.

*See* Maj. Op. at 21-22 & n.11 (discussing whether Aereo's retransmissions

emanate from one master copy, or multiple "unique" copies).  Instead, it states that

**all** technological means of retransmissions are prohibited if they are "capable of"

being received by the public.  It says nothing about the number of copies used by

an infringer.

The Majority's approach also conflicts with the "same/different times" and

"same/separate places" language of the Transmit Clause.[4]  That requires a

---

[4]    *See* 2 PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 7.7.2, at 7:168 (3d ed.
2012 supp.) (broad reading of *Cablevision* renders "same place/same time"
"separate places/different times" language surplusage); Jane C. Ginsburg,
*Recent Developments in U.S. Copyright Law*, REVUE INTERNATIONALE DU
DROIT D'AUTEUR (2009) (*Cablevision* inconsistent with Transmit Clause; it is
"not possible to transmit a performance 'created by *the* act of transmission' to
member of the public 'at different times'"); Brief of *Amicus Curiae* Ralph
Oman, Former Register of Copyrights of the United States, Dkt. 114, at 5
(*Cablevision* "cannot be applied to Aereo's retransmission business. . .
consistent with . . . Copyright Office policy or the purposes underlying the
Copyright Act").

8

retransmitter's multiple transmissions to members of the public, even at the same or different times, to be aggregated and considered a performance "to the public." 17 U.S.C. § 101 (performances "to the public" include transmissions at same/different times and to same/separate places); *see*, *e.g.*, *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 159 (3d Cir. 1984) (aggregating temporally distinct transmissions of movie performances to video rental store customers). All of Aereo's transmissions to its own subscribers, each of whom Aereo renders capable of receiving the retransmission, therefore, should have been aggregated. The Majority's contrary view, that Aereo's retransmissions cannot be aggregated as long as each passes through an instantaneously created copy (which then is erased unless affirmatively stored for later viewing, Maj. Op. 7), starkly contradicts the statute.[5]

That the Majority has strayed very far from congressional intent is further illustrated by the refusal of Congress and the Copyright Office to establish a new statutory licensing scheme for Internet streaming businesses such as Aereo's. *ivi*, 691 F.3d at 282 ("Congress has not codified a statutory provision for Internet

---

[5]  This does not mean that all retransmissions of over-the-air broadcasts, such as from an individual's living room into a bedroom, would be "to the public" because "the original broadcaster" had "once transmitted the same performance." Maj. Op. at 20. Aggregation means only that retransmissions made by a commercial service (Aereo) ***to its own subscribers*** are squarely within the Transmit Clause and, therefore, are aggregated as "to the public."

retransmissions"); 283 (Register of Copyright: license "would have to come from newly-enacted legislation and not existing law."). The Majority's copy-based exception to the Transmit Clause improperly establishes a judicial license, undermines congressional policy and effects a reordering of the relationships between broadcasters and Internet retransmitters. Weighing the disparate interests of broadcasters, copyright owners, retransmitters and the public in determining whether to create exceptions to the statutory regime is properly left to Congress.

## II. The Majority Conflicts With Prior Decisions.

The Majority's analysis also conflicts with fundamental principles applied in other copyright cases, the first of which is that the statutory text controls. *See United States v. Am. Soc'y of Composers,* 627 F.3d 64, 72 (2d Cir. 2010) ("*ASCAP*") (looking first to the "plain and unambiguous" language of 17 U.S.C. § 101). Under "any reasonable construction of the Transmit Clause," Aereo publicly performs Petitioners' programs when, in the words of the statute, it uses a "device or process" (mini-antennae and user-associated copies) to receive and "transmit or otherwise communicate" them to its subscribers "beyond the place from which they are sent." Dissent at 9.

Rather than applying the text of the statute, as required by Circuit precedent and established practice, the Majority based its analysis on "guideposts" it derived from *Cablevision.* Maj. Op. at 22. It concluded that, because both Aereo and

10

Cablevision used subscriber-associated copies, their services were equivalent for public performance purposes. *Id. Cablevision*, however, involved only a system for playing back television programs – a "remote storage DVR" service. Whether subscriber playback of a previously-recorded DVR copy of a television program is lawful, as *Cablevision* held, has no bearing on the lawfulness of a business that retransmits over-the-air broadcasts to thousands of subscribers in real time.

The proper analytical framework is not whether Aereo's design follows "guideposts" teased out of *Cablevision*; it is whether Aereo is the type of retransmission business Congress intended to foreclose with the Transmit Clause. Aereo sends the identical broadcast program to thousands of its subscribers at the same time. The remote storage DVR service at issue in *Cablevision* did not. 536 F.3d at 124-25; Dissent at 18-21. Indeed, the retransmission part of the Cablevision service – which is equivalent to the Aereo service challenged below– was licensed. 536 F.3d at 131. The *Cablevision* court had no reason to address the retransmission of over-the-air broadcasts because that issue was not before it. Whatever *Cablevision* said about the role of individual copies was, therefore, limited to stored television programs and provides no "guideposts" with respect to retransmissions like Aereo's. It provides no reason not to apply the language of the Transmit Clause to a retransmission service.

11

In *Cablevision*, the court cautioned against expansive interpretations of its analysis.  The court stated only that unique, subscriber-associated copies "***may***" – not must – serve an "audience-limiting" function and that they therefore are "***relevant***" – not determinative – of whether a performance is "to the public."  536 F.3d at 137-39.  The Majority ignored that warning.  None of the "audience-limiting" facts before the court in *Cablevision* are present in this case (*e.g.*, copies could be played back only to the same set-top box licensed to receive the originally broadcast program; copies could be played back only after the program aired).  Unlike Cablevision's service, Aereo makes all of its subscribers capable of receiving the same performance of a copyrighted work simultaneously and only seconds after the initial transmission.  Dissent at 4.

The Majority's reasoning departs from an unbroken line of cases in this Circuit and elsewhere holding that unauthorized retransmissions – even on a one-to-one basis over the Internet to individual subscribers – violate the public performance right.[6]  That has been law in this Circuit since at least 1998.  *See*

---

[6]   *See CBS Broad., Inc. v. FilmOn.com, Inc.*, No. 10-cv-07532 (S.D.N.Y. Nov. 22, 2010) (temporarily restraining Internet retransmissions of over-the-air broadcasts); *Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1007 (C.D. Cal. Aug. 1, 2011) (streaming from individually "rented" remote DVD player was a public performance); *Live Nation Motor Sports, Inc. v. Davis*, No. 3:06-CV-276-L, 2007 WL 79311 (N.D. Tex. Jan. 9, 2007) (audio webcasts infringe public performance right); *Video Pipeline, Inc. v. Buena*

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 106-07 (2d Cir. 1998) (telephone line retransmissions of radio broadcasts to individual subscribers infringe public performance right).  *See also ASCAP*, 627 F.3d at 74 (streaming of music, like a "television or radio broadcast," is a public performance; contrasting download, which is like a playback).  Moreover, less than four months ago, an Aereo copycat named "Aereokiller" was preliminarily enjoined, even though Aereokiller purported to use antennae and copies "technologically analogous" to Aereo's.  *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 2012 WL 6784498, at *3-4 (C.D. Cal. Dec. 27, 2012) (rejecting *Cablevision* and *Aereo*), *appeal pending* U. S. Court Of Appeals For The Ninth Circuit, Case No. 13-55156.

The conclusion that Aereo's service does no more than facilitate private retransmissions also ignores the logic underlying *NFL v. PrimeTime 24*, 211 F.3d 10 (2d Cir. 2000).  That decision established the principle that "***each*** step in the process by which a protected work wends its way to its audience" constitutes a public performance.  *Id.* at 13 (emphasis added).  Under *NFL*, Aereo's antennas and copies are but links in a chain of retransmissions that ultimately reach the

---

*Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 332 (D.N.J. 2002) (Internet transmissions of video clips are public performances), *aff'd on other grounds*, 342 F.3d 191 (3d Cir. 2003).

thousands of Aereo subscribers made capable of watching the same program at the same time.  Dissent at 3.

That *Cablevision* might be extended to a very different service – let alone one that is functionally identical to other real-time retransmission services – has been a concern for years.  As noted, then-Solicitor General Kagan warned against extending the *Cablevision* analysis, including to "***situations in which a party streams copyrighted material on an individualized basis over the Internet.***" Amicus Br. at 20-21 (emphasis added).  The Majority now has done precisely what the Solicitor General cautioned against:  applying *Cablevision* beyond the facts and logic that were thought to limit its application.

Finally, the Majority itself tacitly recognized the consequences of its emphasis on the game-changing role of subscriber-associated digital copies: "Perhaps the application of the Transmit Clause should focus less on the technical details of a particular system and more on its functionality, but this Court's decisions in *Cablevision* and *NFL* . . . held that architecture matters."  Maj. Op. at 31.  In fact, the "any device or process" language of the Transmit Clause already instructs courts that "technical details" are ***not*** to be given controlling effect when determining whether a service infringes the public performance right. Accordingly, the "architecture" of Aereo's system should not have made a

14

substantive difference in the outcome.  As Judge Chin put it, "Aereo's 'technology platform' is . . . a sham . . . over-engineered in an attempt to avoid the reach of the Copyright Act."  Dissent at 2.  Relying on such a "Rube Goldberg-like contrivance" to assert that the Transmit Clause is inapplicable is the height of elevating "form over substance."  Dissent at 2, 4.

## CONCLUSION

For the foregoing reasons, the Majority Opinion raises a question of exceptional importance, conflicts with prior decisions of this Court, and thus warrants rehearing and *en banc* review pursuant to Fed. R. App. P. 35(a).

Dated:  April 15, 2013

Respectfully submitted,

By:    /s/ Bruce P. Keller

DEBEVOISE & PLIMPTON LLP

Bruce P. Keller
Jeffrey P. Cunard
Michael R. Potenza
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6000

*Attorneys for Petitioners-Plaintiffs–*
*Counter-Defendants–Appellants*

15

# EXHIBIT A

**12-2786-cv; 12-2807-cv**
**WNET, Thirteen v. Aereo, Inc.; Am. Broad. Cos., Inc. v. Aereo, Inc.**

1
2                  **UNITED STATES COURT OF APPEALS**
3                      **FOR THE SECOND CIRCUIT**
4
5
6                          August Term, 2012
7
8        (Argued: November 30, 2012        Decided: April 1, 2013)
9
10
11                   Docket Nos. 12-2786-cv, 12-2807-cv
12
13   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
14
15   WNET, THIRTEEN, FOX TELEVISION
16   STATIONS, INC., TWENTIETH CENTURY FOX
17   FILM CORPORATION, WPIX, INC., UNIVISION
18   TELEVISION GROUP, INC., THE UNIVISION
19   NETWORK LIMITED PARTNERSHIP, AND
20   PUBLIC BROADCASTING SERVICE,
21
22            *Plaintiffs-Counter-Defendants-Appellants*,
23
24                    v.                         12-2786-cv
25
26   AEREO, INC., F/K/A BAMBOOM LABS, INC.,
27
28            *Defendant-Counter-Claimant-Appellee*,
29
30   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
31
32   AMERICAN BROADCASTING COMPANIES, INC.,
33   DISNEY ENTERPRISES, INC., CBS
34   BROADCASTING INC., CBS STUDIOS INC.,
35   NBCUNIVERSAL MEDIA, LLC, NBC STUDIOS,
36   LLC, UNIVERSAL NETWORK TELEVISION,
37   LLC, TELEMUNDO NETWORK GROUP LLC,
38   AND WNJU-TV BROADCASTING LLC,
39
40            *Plaintiffs-Counter-Defendants-Appellants*,
41

1

1                         v.                              12-2807-cv

2

3    AEREO, INC.,

4

5                  *Defendant-Counter-Claimant-Appellee*,

6

7    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

8

9    Before:

10        CHIN and DRONEY, *Circuit Judges*, GLEESON, *District Judge*.[*]

11

12        Appeal from an order of the United States District Court for the Southern District of New
13   York (Nathan, *J.*) denying Plaintiffs' motion for a preliminary injunction barring Defendant Aereo
14   from transmitting recorded broadcast television programs to its subscribers while the programs are
15   airing on broadcast television. The district court correctly concluded that Aereo's system is not
16   materially distinguishable from the system upheld in *Cartoon Network LP, LLLP v. CSC Holdings,
17   Inc.*, 536 F.3d 121 (2d Cir. 2008). We therefore AFFIRM the order of the district court.

18

19        Judge CHIN dissents in a separate opinion.

20

21                                                PAUL M. SMITH, Steven B. Fabrizio, Scott B. Wilkens,
22                                                Matthew E. Price, Jenner & Block LLP, Washington, DC;
23                                                Richard L. Stone, Amy M. Gallegos, Jenner & Block
24                                                LLP, Los Angeles, CA, *for Plaintiffs-Appellants WNET,
25                                                Thirteen, et al.*

26

27                                                BRUCE P. KELLER, Jeffrey P. Cunard, Michael R. Potenza,
28                                                Debevoise & Plimpton LLP, New York, NY, *for
29                                                Plaintiffs-Appellants Am. Broad. Cos., Inc., et al.*

30

31                                                R. DAVID HOSP, John C. Englander, Mark S. Puzella,
32                                                Yvonne W Chan, Erin M. Michael, Goodwin Procter
33                                                LLP, Boston, MA; Michael S. Elkin, Thomas P. Lane,
34                                                Winston & Strawn LLP, New York, NY; Seth D.
35                                                Greenstein, Constantine Cannon LLP, Washington, DC;
36                                                Jennifer A. Golinveaux, Winston & Strawn LLP, San
37                                                Francisco, CA, *for Defendant-Appellee*.

38

---

[*]The Honorable John Gleeson, United States District Court for the Eastern District of
New York, sitting by designation.

Robert Alan Garrett, Lisa S. Blatt, Stephen M. Marsh, R. Stanton Jones, Arnold & Porter LLP, Washington, DC, *for amici curiae National Basketball Association, NBA Media Ventures, LLC, NBA Properties, Inc., National Football League, National Hockey League, Office of the Commissioner of Baseball, and MLB Advanced Media, L.P. in support of Plaintiffs-Appellants.*

Kelly M. Klaus, Munger, Tolles & Olson LLP, Los Angeles, CA; Samantha Dulaney, I.A.T.S.E. In House Counsel, New York, NY; Duncan W. Crabtree-Ireland, Chief Administrative Officer & General Counsel, SAG-AFTRA, Los Angeles, CA; Anthony R. Segall, Rothner, Segall & Greenstone, Pasadena, CA; Susan Cleary, Vice President & General Counsel, Independent Film & Television Alliance, Los Angeles, CA, *for amici curiae Paramount Pictures Corporation, Warner Bros. Entertainment Inc., Directors Guild of America, Inc., Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada, AFL-CIO, CLC, Screen Actors Guild-American Federation of Television and Radio Artists, Writers Guild of America, West, Inc., Independent Film & Television Alliance, Lions Gate Entertainment, Inc., and Metro-Goldwyn-Mayer Studios Inc. in support of Plaintiffs-Appellants.*

Robert A. Long, Matthew S. DelNero, Daniel Kahn, Covington & Burling LLP, Washington, DC, *for amici curiae The National Association of Broadcasters, The ABC Television Affiliates Association, The CBS Television Network Affiliates Association, The NBC Television Affiliates, and The Fox Television Affiliates Association in support of Plaintiffs-Appellants.*

Jeffrey A. Lamken, Robert K. Kry, MoloLamken LLP, Washington, DC, *for amicus curiae Cablevision Systems Corporation in support of Plaintiffs-Appellants.*

Steven J. Metalitz, Eric J. Schwartz, J. Matthew Williams, Mitchell Silberberg & Knupp LLP, Washington, DC; Paul V. LiCalsi, Mitchell Silberberg & Knupp LLP, New York, NY, *for amici curiae The American Society of*

*Composers, Authors and Publishers, Broadcast Music, Inc., The National Music Publishers Association, The Association of Independent Music Publishers, The Church Music Publishers Association, The Nashville Songwriters Association International, The Recording Industry Association of America, the Recording Academy, SESAC, Inc., The Society of Composers & Lyricists, The Songwriters Guild of America, Inc., and Soundexchange, Inc., in support of Plaintiffs-Appellants.*

Ralph Oman, The George Washington University Law School, Washington, DC, *for amicus curiae Ralph Oman, Former Register of Copyrights of the United States in support of Plaintiffs-Appellants.*

Jonathan Band, Jonathan Band PLLC, Washington, DC, *for amici curiae The Computer & Communications Industry Association and The Internet Association in support of Defendant-Appellee.*

Michael C. Rakower, Law Office of Michael C. Rakower, P.C., New York, NY, *for amici curiae Intellectual Property and Copyright Law Professors in support of Defendant-Appellee.*

Mitchell L. Stoltz, Electronic Frontier Foundation, San Francisco, CA; Sherin Siy, John Bergmayer, Public Knowledge, Washington, DC; Michael Petricone, Consumer Electronics Association, Arlington, VA, *for amici curiae The Electronic Frontier Foundation, Public Knowledge, and The Consumer Electronics Association in support of Defendant-Appellee.*

Peter Jaszi, Kate Collins, Seth O. Dennis, Sarah K. Leggin, Bijan Madhani, American University Washington College of Law, Washington, DC, *for amici curiae The Consumer Federation of America and Consumers Union in support of Defendant-Appellee.*

4

1   D<small>RONEY</small>, *Circuit Judge*:

2       Aereo, Inc. ("Aereo") enables its subscribers to watch broadcast television programs over

3   the internet for a monthly fee. Two groups of plaintiffs, holders of copyrights in programs broadcast

4   on network television, filed copyright infringement actions against Aereo in the United States

5   District Court for the Southern District of New York. They moved for a preliminary injunction

6   barring Aereo from transmitting programs to its subscribers while the programs are still airing,

7   claiming that those transmissions infringe their exclusive right to publicly perform their works. The

8   district court (Nathan, *J.*) denied the motion, concluding that the plaintiffs were unlikely to prevail

9   on the merits in light of our prior decision in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536

10   F.3d 121 (2d Cir. 2008) ("*Cablevision*"). We agree and affirm the order of the district court denying

11   the motion for a preliminary injunction.[1]

12              **BACKGROUND**

13       The parties below agreed on all but one of the relevant facts of Aereo's system, namely

14   whether Aereo's antennas operate independently or as a unit. The district court resolved that

15   issue, finding that Aereo's antennas operate independently. The Plaintiffs do not appeal that

16   factual finding. Thus the following facts are undisputed.

17   **I.**    **Aereo's System**

18       Aereo transmits to its subscribers broadcast television programs over the internet for a

19   monthly subscription fee. Aereo is currently limited to subscribers living in New York City and

---

[1]The two actions, although not consolidated in the district court, proceeded in tandem and the district court's order applied to both actions.

1    offers only New York area channels. It does not have any license from copyright holders to

2    record or transmit their programs.

3         The details of Aereo's system are best explained from two perspectives. From its

4    subscribers' perspective, Aereo functions much like a television with a remote Digital Video

5    Recorder ("DVR") and Slingbox.[2] Behind the scenes, Aereo's system uses antennas and a

6    remote hard drive to create individual copies of the programs Aereo users wish to watch while

7    they are being broadcast or at a later time. These copies are used to transmit the programs to the

8    Aereo subscriber.

9         **A.    *The Subscriber's Perspective***

10        Aereo subscribers begin by logging on to their account on Aereo's website using a

11   computer or other internet-connected device. They are then presented with a programming guide

12   listing broadcast television programs now airing or that will air in the future. If a user selects a

13   program that is currently airing, he is presented with two options: "Watch" and "Record." If the

14   user selects "Watch," the program he selected begins playing, but the transmission is briefly

15   delayed relative to the live television broadcast.[3] Thus the user can watch the program nearly

16   live, that is, almost contemporaneously with the over-the-air broadcast. While the user is

17   watching the program with the "Watch" function, he can pause or rewind it as far back as the

---

[2]A Slingbox is a device that connects the user's cable or satellite set-top box or DVR to the internet, allowing the user to watch live or recorded programs on an internet-connected mobile device, such as a laptop or tablet.

[3]The technical operation of Aereo's system, discussed below, results in a slight delay in transmitting the program, which means that an Aereo subscriber using the "Watch" feature sees the program delayed by approximately ten seconds.

6

1     point when the user first began watching the program.[4] This may result in the user watching the

2     program with the "Watch" feature after the over-the-air broadcast has ended. At any point while

3     watching the program with the "Watch" feature, the user can select the "Record" button, which

4     will cause Aereo's system to save a copy of the program for later viewing. The recorded copy of

5     the program will begin from the point when the user first began watching the program, not from

6     the time when the user first pressed the "Record" button.[5] If a user in "Watch" mode does not

7     press "Record" before the conclusion of the program, the user is not able to watch that program

8     again later.

9          An Aereo user can also select a program that is currently airing and press the "Record"

10    button. In that case, a copy of the program will be saved for later viewing. However, the

11    "Record" function can also be used to watch a program nearly live, because the user can begin

12    playback of the program being recorded while the recording is being made. Thus the difference

13    between selecting the "Watch" and the "Record" features for a program currently airing is that

14    the "Watch" feature begins playback and a copy of the program is not retained for later viewing,

15    while the "Record" feature saves a copy for later viewing but does not begin playback without

16    further action by the user.

17          If an Aereo user selects a program that will air in the future, the user's only option is the

18    "Record" function. When the user selects that function, Aereo's system will record the program

---

[4]Thus if an Aereo user starts watching a program five minutes after it first began airing, he can rewind back to the five-minute mark, but not earlier.

[5]Thus if an Aereo user starts watching a program five minutes after it first began airing and presses the "Record" button at the twenty-minute mark, the recorded copy will begin from the five-minute mark.

1    when it airs, saving a copy for the user to watch later. An Aereo user cannot, however, choose

2    either to "Record" or "Watch" a program that has already finished airing if he did not previously

3    elect to record the program.

4        The final notable feature of Aereo's system is that users can watch Aereo programing on

5    a variety of devices. Aereo's primary means of transmitting a program to a user is via an internet

6    browser, which users can access on their computers. Aereo users can also watch programs on

7    mobile devices such as tablets or smart phones using mobile applications. Finally, Aereo

8    subscribers can watch Aereo on an internet-connected TV or use a stand-alone device to connect

9    their non-internet TVs to Aereo.

10        Aereo's system thus provides the functionality of three devices: a standard TV antenna, a

11    DVR, and a Slingbox-like device. These devices allow one to watch live television with the

12    antenna; pause and record live television and watch recorded programing using the DVR; and

13    use the Slingbox to watch both live and recorded programs on internet-connected mobile

14    devices.

15        **B.    *The Technical Aspects of Aereo's System***

16        Aereo has large antenna boards at its facility in Brooklyn, New York. Each of these

17    boards contains approximately eighty antennas, which consist of two metal loops roughly the

18    size of a dime. These boards are installed parallel to each other in a large metal housing such that

19    the antennas extend out of the housing and can receive broadcast TV signals. Aereo's facility

20    thus uses thousands of individual antennas to receive broadcast television channels.[6]

---

[6]As mentioned in the text above, the lone factual dispute below was whether Aereo's
antennas function independently or as one unit. The district court resolved this dispute in favor

8

1        When an Aereo user selects a program to watch or record, a signal is sent to Aereo's

2    antenna server. The antenna server assigns one of the individual antennas and a transcoder to the

3    user. The antenna server tunes that antenna to the broadcast frequency of the channel showing

4    the program the user wishes to watch or record. The server transcodes the data received by this

5    antenna, buffers it, and sends it to another Aereo server, where a copy of the program is saved to

6    a large hard drive in a directory reserved for that Aereo user. If the user has chosen to "Record"

7    the program, the Aereo system will create a complete copy of the program for that user to watch

8    later. When the user chooses to view that program, Aereo's servers will stream the program to

9    the user from the copy of the program saved in the user's directory on the Aereo server. If the

10    user instead has chosen to "Watch" the program, the same operations occur, except that once six

11    or seven seconds of programming have been saved in the hard drive copy of the program in the

12    user's directory on the Aereo server, the Aereo system begins streaming the program to the user

13    from this copy. Thus even when an Aereo user is watching a program using the "Watch" feature,

14    he is not watching the feed directly or immediately from the antenna assigned to him. Rather the

15    feed from that antenna is used to create a copy of the program on the Aereo server, and that copy

16    is then transmitted to the user. If at any point before the program ends, the user in "Watch" mode

17    selects "Record," the copy of the program is retained for later viewing. If the user does not press

18    "Record" before the program ends, the copy of the program created for and used to transmit the

19    program to the user is automatically deleted when it has finished playing.

---

of Aereo, finding that its antennas operate independently. *Am. Broad. Cos., Inc. v. Aereo*, 874 F.
Supp. 2d 373, 381 (S.D.N.Y. 2012). The Plaintiffs do not contest this finding on appeal.

1        Three technical details of Aereo's system merit further elaboration. First, Aereo assigns

2   an individual antenna to each user. No two users share the same antenna at the same time, even if

3   they are watching or recording the same program.[7] Second, the signal received by each antenna

4   is used to create an individual copy of the program in the user's personal directory. Even when

5   two users are watching or recording the same program, a separate copy of the program is created

6   for each. Finally, when a user watches a program, whether nearly live or previously recorded, he

7   sees his individual copy on his TV, computer, or mobile-device screen. Each copy of a program

8   is only accessible to the user who requested that the copy be made, whether that copy is used to

9   watch the program nearly live or hours after it has finished airing; no other Aereo user can ever

10  view that particular copy.

11  **II.      The Present Suits**

12        Two groups of plaintiffs (the "Plaintiffs") filed separate copyright infringement actions

13  against Aereo in the Southern District of New York. They asserted multiple theories, including

14  infringement of the public performance right, infringement of the right of reproduction, and

15  contributory infringement. ABC and its co-plaintiffs moved for a preliminary injunction barring

16  Aereo from transmitting television programs to its subscribers while the programs were still

---

[7]Aereo's system usually assigns these antennas dynamically. Aereo users "share" antennas in the sense that one user is using a particular antenna now, and another may use the same antenna when the first is no longer using it. But at any given time, the feed from each antenna is used to create only one user's copy of the program being watched or recorded. Thus if 10,000 Aereo users are watching or recording the Super Bowl, Aereo has 10,000 antennas tuned to the channel broadcasting it.

1    being broadcast. The two sets of plaintiffs agreed to proceed before the district court in tandem,

2    and the motion for preliminary injunction was pursued in both actions simultaneously.

3           Following expedited briefing and discovery and an evidentiary hearing, the district court

4    denied the Plaintiffs' motion. *Am. Broad. Cos., Inc. v. Aereo*, 874 F. Supp. 2d 373, 405

5    (S.D.N.Y. 2012). The district court began its analysis with the first factor relevant to granting a

6    preliminary injunction: whether the Plaintiffs have demonstrated a likelihood of success on the

7    merits. *Id.* at 381 (citing *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)). The district court

8    found that this factor was determined by our prior decision in *Cablevision*, 536 F.3d 121. *Aereo*,

9    874 F. Supp. 2d at 381-82. After a lengthy discussion of the facts and analysis of that decision,

10   the district court concluded that Aereo's system was not materially distinguishable from

11   Cablevision's Remote Storage Digital Video Recorder system, which we held did not infringe

12   copyright holders' public performance right. *Id.* at 385-86. The district court found unpersuasive

13   each of the Plaintiffs' arguments attempting to distinguish *Cablevision*. *See id.* at 386-96. Thus

14   the court concluded that the Plaintiffs were unlikely to prevail on the merits. *Id.* at 396.

15          The district court then considered the other three preliminary injunction factors. First, the

16   court concluded that the Plaintiffs had demonstrated a likelihood that they would suffer

17   irreparable harm in the absence of a preliminary injunction. *Id.* at 396-402. But second, the

18   district court found that an injunction would severely harm Aereo, likely ending its business. *Id.*

19   at 402-03. As such, the balance of hardships did not tip "decidedly" in favor of the Plaintiffs. *Id.*

20   at 403. Finally, the district court concluded that an injunction "would not disserve the public

21   interest." *Id.* at 403-04. Because the Plaintiffs had not demonstrated a likelihood of success on

1 the merits or a balance of hardship tipping decidedly in their favor, the district court denied their

2 motion for a preliminary injunction. *Id.* at 405. The Plaintiffs promptly filed an interlocutory

3 appeal, and this case was briefed on an expedited schedule.

4 **DISCUSSION**

5   We review a district court's denial of a preliminary injunction for abuse of discretion.

6 *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012). A district court abuses its discretion

7 when its decision rests on legal error or a clearly erroneous factual finding, or when its decision,

8 though not the product of legal error or a clearly erroneous factual finding, cannot be located

9 within the range of permissible decisions. *Id.*

10   Our decisions identify four factors relevant to granting a preliminary injunction for

11 copyright infringement. First, a district court may issue a preliminary injunction "only if the

12 plaintiff has demonstrated either (a) a likelihood of success on the merits or (b) sufficiently

13 serious questions going to the merits to make them a fair ground for litigation and a balance of

14 hardships tipping decidedly in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir.

15 2010) (internal citation and quotation marks omitted). Second, a plaintiff seeking a preliminary

16 injunction must demonstrate "'that he is likely to suffer irreparable injury in the absence of'" an

17 injunction. *Id.* at 79-80 (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)). A

18 court may not presume irreparable injury in the copyright context; rather the plaintiff must

19 demonstrate actual harm that cannot be remedied later by damages should the plaintiff prevail on

20 the merits. *Id.* at 80 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Third,

21 a district court "must consider the balance of hardships between the plaintiff and defendant and

12

1    issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Id.* Fourth and

2    finally, "the court must ensure that 'the public interest would not be disserved' by the issuance of

3    a preliminary injunction." *Id.* (quoting *eBay*, 547 U.S. at 391).

4        The outcome of this appeal turns on whether Aereo's service infringes the Plaintiffs'

5    public performance right under the Copyright Act. The district court denied the injunction,

6    concluding, as mentioned above, that (1) Plaintiffs were not likely to prevail on the merits given

7    our prior decision in *Cablevision* and (2) the balance of hardships did not tip "decidedly" in the

8    Plaintiffs' favor. *Aereo*, 874 F. Supp. 2d at 405. Plaintiffs' likelihood of success on the merits

9    depends on whether Aereo's service infringes Plaintiffs' copyrights. And, as we discuss further

10   below, the balance of hardships is largely a function of whether the harm Aereo would suffer

11   from the issuance of an injunction is legally cognizable, which in turn depends on whether Aereo

12   is infringing the Plaintiffs' copyrights. *See ivi*, 691 F.3d at 287. As a result, a preliminary

13   injunction can only be granted if Plaintiffs can show that Aereo infringes their public

14   performance right. We now turn to that issue.

15   **I.**     **The Public Performance Right**

16        The 1976 Copyright Act (the "Act") gives copyright owners several exclusive rights and

17   then carves out a number of exceptions. The fourth of these rights, at issue in this appeal, is the

18   copyright owner's exclusive right "in the case of literary, musical, dramatic, and choreographic

19   works, pantomimes, and motion pictures and other audiovisual works, to perform the

20   copyrighted work publicly." 17 U.S.C. § 106(4). The Act defines "perform" as "to recite, render,

21   play, dance, or act [a work], either directly or by means of any device or process or, in the case

1    of a motion picture or other audiovisual work, to show its images in any sequence or to make the

2    sounds accompanying it audible." 17 U.S.C. § 101. The Act also states:

3          To perform or display a work "publicly" means-
4              (1)    to perform or display it at a place open to the public or at any place
5              where a substantial number of persons outside of a normal circle of a
6              family and its social acquaintances is gathered; or
7              (2)    to transmit or otherwise communicate a performance or display of
8              the work to a place specified by clause (1) or to the public, by means of
9              any device or process, whether the members of the public capable of
10             receiving the performance or display receive it in the same place or in
11             separate places and at the same time or at different times.
12
13   17 U.S.C. § 101. This appeal turns on the second clause of this definition (the "Transmit Clause"

14   or "Clause").

15         The relevant history of the Transmit Clause begins with two decisions of the Supreme

16   Court, *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968), and

17   *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394 (1974). These

18   decisions held that under the then-current 1909 Copyright Act, which lacked any analog to the

19   Transmit Clause, a cable television system that received broadcast television signals via antenna

20   and retransmitted these signals to its subscribers via coaxial cable did not "perform" the

21   copyrighted works and therefore did not infringe copyright holders' public performance right.

22   *Teleprompter*, 415 U.S. at 408; *Fortnightly*, 392 U.S. at 399-401. Even before these cases were

23   decided, Congress had begun drafting a new copyright act to respond to changes in technology,

24   most notably, cable television.

25         These efforts resulted in the 1976 Copyright Act. The Act responded to the emergence of

26   cable television systems in two ways. First, it added the Transmit Clause. The legislative history

1    shows that the Transmit Clause was intended in part to abrogate *Fortnightly* and *Teleprompter*

2    and bring a cable television system's retransmission of broadcast television programming within

3    the scope of the public performance right. H.R. Rep. 94-1476, 1976 U.S.C.C.A.N. 5659, at 63

4    (1976) ("House Report") ("[A] sing[er] is performing when he or she sings a song; a

5    broadcasting network is performing when it transmits his or her performance (whether

6    simultaneously or from records); a local broadcaster is performing when it transmits the network

7    broadcast; a cable television system is performing when it retransmits the broadcast to its

8    subscribers; and any individual is performing when he or she plays a phonorecord embodying

9    the performance or communicates it by turning on a receiving set."). Second, Congress

10    recognized that requiring cable television systems to obtain a negotiated license from individual

11    copyright holders may deter further investment in cable systems, so it created a compulsory

12    license for retransmissions by cable systems.[8] *See* 17 U.S.C. § 111(d).

13        Plaintiffs claim that Aereo's transmissions of broadcast television programs while the

14    programs are airing on broadcast television fall within the plain language of the Transmit Clause

15    and are analogous to the retransmissions of network programing made by cable systems, which

16    the drafters of the 1976 Copyright Act viewed as public performances. They therefore believe

---

[8]Put briefly, the statute allows cable systems to retransmit copyrighted works from broadcast television stations in exchange for paying a compulsory license to the U.S. Copyright Office calculated according to a defined formula. The fees paid by cable systems are then distributed to copyright holders. *See ivi*, 691 F.3d at 281; *E. Microwave, Inc. v. Doubleday Sports, Inc.*, 691 F.2d 125, 128-29 (2d Cir. 1982).

1    that Aereo is publicly performing their copyrighted works without a license.[9] In evaluating their

2    claims, we do not work from a blank slate. Rather, this Court in *Cablevision*, 536 F.3d 121,

3    closely analyzed and construed the Transmit Clause in a similar factual context. Thus the

4    question of whether Aereo's transmissions are public performances under the Transmit Clause

5    must begin with a discussion of *Cablevision*.

6    **II.    *Cablevision*'s Interpretation of the Transmit Clause**

7            In *Cablevision*, 536 F.3d 121, we considered whether Cablevision's Remote Storage

8    Digital Video Recorder ("RS-DVR") infringed copyright holders' reproduction and public

9    performance rights. Cablevision, a cable television system, wished to offer its customers its

10   newly designed RS-DVR system, which would give them the functionality of a stand-alone DVR

11   via their cable set-top box. 536 F.3d at 124-25. Before the development of the RS-DVR system,

12   Cablevision would receive programming from various content providers, such as ESPN or a

13   local affiliate of a national broadcast network, process it, and transmit it to its subscribers

14   through coaxial cable in real time. *Id.* With the RS-DVR system, Cablevision split this stream

15   into two. One stream went out to customers live as before. The second stream was routed to a

16   server, which determined whether any Cablevision customers had requested to record a program

17   in the live stream with their RS-DVR. If so, the data for that program was buffered, and a copy

18   of that program was created for that Cablevision customer on a portion of a Cablevision remote

---

[9]Plaintiffs assert that Aereo's transmissions of recorded programs when the original program is no longer airing on broadcast television are also public performances and that Aereo's system infringes other exclusive rights granted by the Copyright Act, such as the reproduction right. Plaintiffs did not, however, present these claims as a basis for the preliminary injunction. They are therefore not before us and we will not consider them.

1    hard drive assigned solely to that customer. Thus if 10,000 Cablevision customers wished to

2    record the Super Bowl, Cablevision would create 10,000 copies of the broadcast, one for each

3    customer. A customer who requested that the program be recorded could later play back the

4    program using his cable remote, and Cablevision would transmit the customer's saved copy of

5    that program to the customer. Only the customer who requested that the RS-DVR record the

6    program could access the copy created for him; no other Cablevision customer could view this

7    particular copy.[10] *See* 536 F.3d at 124-25.

8           Copyright holders in movies and television programs sued, arguing that Cablevision's

9    RS-DVR system infringed their reproduction right by creating unauthorized copies of their

10   programs and their public performance right by transmitting these copies to Cablevision

11   customers who previously requested to record the programs using their RS-DVRs. The district

12   court granted the plaintiffs' motion for summary judgment and issued an injunction against

13   Cablevision. *See Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d

14   607 (S.D.N.Y. 2007). The court found that the RS-DVR infringed the plaintiffs' reproduction

15   right in two ways: (1) by creating temporary buffer copies of programs in order to create a

16   permanent copy for each of its customers on its hard drives and (2) by creating a permanent copy

17   of the program for each customer. *Id.* at 617-22. The court also found that Cablevision's

18   transmission of a recorded program to the customer who had requested to record the program

---

[10] The RS-DVR was therefore unlike a video-on-demand service because it did not enable a customer to watch a program that had already been broadcast unless that customer had previously requested that the program be recorded and because it generated user-associated copies instead of using a shared copy or copies.

1  was a public performance under the Transmit Clause and therefore was infringing on that basis

2  as well. *Id.* at 622-23.

3        This Court reversed on all three issues. *Cablevision*, 536 F.3d at 140. Because the

4  Plaintiffs in the present cases did not pursue their claim that Aereo infringes their reproduction

5  right in the injunction application before the district court, we need not discuss the two

6  reproduction right holdings of *Cablevision* except where relevant to the public performance

7  issue. Instead, we will focus on *Cablevision*'s interpretation of the public performance right and

8  the Transmit Clause, which the court below found determinative of the injunction application.

9        The *Cablevision* court began by discussing the language and legislative history of the

10 Transmit Clause. 536 F.3d at 134-35. Based on language in the Clause specifying that a

11 transmission may be "to the public . . . whether the members of the public capable of receiving

12 the performance . . . receive it in the same place or in separate places and at the same time or at

13 different times," 17 U.S.C. § 101, this Court concluded that "it is of no moment that the potential

14 recipients of the transmission are in different places, or that they may receive the transmission at

15 different times." 536 F.3d at 134. As the language makes plain, in determining whether a

16 transmission is to the public it is important "to discern who is 'capable of receiving' the

17 performance being transmitted." *Id.* (quoting 17 U.S.C. § 101). *Cablevision* then decided that

18 "capable of receiving the performance" refers not to the performance of the underlying work

19 being transmitted but rather to the transmission itself, since the "transmission of a performance is

20 itself a performance." *Id.* The Court therefore concluded that "the transmit clause directs us to

18

1    examine who precisely is 'capable of receiving' *a particular transmission of a performance*."

2    536 F.3d at 135 (emphasis added).

3            In adopting this interpretation of the Transmit Clause, *Cablevision* rejected two

4    alternative readings. First, it considered the interpretation accepted by the district court in that

5    case. According to that view, a transmission is "to the public," not based on the "potential

6    audience of a particular transmission" but rather based on the "potential audience of the

7    underlying work (i.e., 'the program') whose content is being transmitted." *Id.* at 135. The

8    *Cablevision* court rejected this interpretation of the Transmit Clause. Given that "the *potential*

9    audience for every copyrighted audiovisual work is the general public," this interpretation would

10   render the "to the public" language of the Clause superfluous and contradict the Clause's

11   obvious contemplation of non-public transmissions. *Id.* at 135-36.

12           Second, the *Cablevision* court considered "a slight variation of this interpretation"

13   offered by the plaintiffs. *Id.* Plaintiffs argued that "both in its real-time cablecast and via the RS-

14   DVR playback, Cablevision is in fact transmitting the 'same performance' of a given work: the

15   performance that occurs when the programming service supplying Cablevision's content

16   transmits that content to Cablevision and the service's other licensees." *Id.* In this view, the

17   Transmit Clause requires courts to consider "not only the potential audience [of a particular]

18   transmission, but also the potential audience of any transmission of the same underlying

19   'original' performance." *Id.* This interpretation of the Transmit Clause would aggregate all

20   transmissions of the same underlying performance, and if these transmissions enabled the

21   performance to reach the public, each transmission, regardless of its potential audience, should

be deemed a public performance. *Cablevision* rejected this view because it would make a

seemingly private transmission public by virtue of actions taken by third parties. *Id.* For

example, if a person records a program and then transmits that recording to a television in

another room, he would be publicly performing the work because some other party, namely the

original broadcaster, had once transmitted the same performance to the public. *Id.* The

*Cablevision* court concluded that Congress could not have intended "such odd results"; instead,

the Transmit Clause directed courts to consider only the potential audience of the "performance

created by the act of transmission." *Id.* The *Cablevision* court found this interpretation consistent

with prior opinions of this Court construing the Clause. *Id.*; *see Nat'l Football League v.*

*PrimeTime 24 Joint Venture*, 211 F.3d 10 (2d Cir. 2000).

Finally, the *Cablevision* court considered *Columbia Pictures Industries, Inc. v. Redd*

*Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984). In *Redd Horne*, the defendant operated a video rental

store that utilized private booths containing individual televisions. Customers would select a

movie from the store's catalog and enter a booth. A store employee would then load a copy of

the movie into a VCR hard-wired to the TV in the customer's booth and transmit the content of

the tape to the television in the booth. *See* 749 F.2d at 156-57. The Third Circuit, following an

interpretation of the Transmit Clause first advanced by Professor Nimmer, held that this was a

public performance because the same copy of the work, namely the individual video cassette,

was repeatedly "performed" to different members of the public at different times. *Id.* at 159

(quoting 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.14[C][3], at

20

1    8.192.8(1) (Matthew Bender rev. ed.)). The *Cablevision* court endorsed this conclusion[11];

2    whether a transmission originates from a distinct or shared copy is relevant to the Transmit

3    Clause analysis because "the use of a unique copy may limit the potential audience of a

4    transmission and is therefore relevant to whether that transmission is made 'to the public.'" 536

5    F.3d at 138.

6          Applying this interpretation of the Transmit Clause to the facts of the RS-DVR, the

7    *Cablevision* court concluded that Cablevision's transmission of a recorded program to an

8    individual subscriber was not a public performance. *Id.* Each transmission of a program could be

9    received by only one Cablevision customer, namely the customer who requested that the copy be

10    created. No other Cablevision customer could receive a transmission generated from that

11    particular copy. The "universe of people capable of receiving an RS-DVR transmission is the

12    single subscriber whose self-made copy is used to create that transmission." *Id.* at 137. The

---

[11]Aggregating private transmissions generated from the same copy is in some tension with the *Cablevision* court's first conclusion that the relevant inquiry under the Transmit Clause is the potential audience of the particular transmission. This interpretation of the Transmit Clause began with Professor Nimmer. He notes that it is difficult to understand precisely what Congress intended with the language in the Clause stating that a public performance can occur when the audience receives the work "at different times." *See* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.14[C][3], at 8.192.8 (Matthew Bender rev. ed.)). Arguing that this language on its face conflicted with other language in the statute and produced results Congress could not have intended, he proposed that by this language Congress wished to denote instances where the same copy of the work was repeatedly performed by different members of the public at different times. *See id.* at 192.8(1)-192.8(6). The *Cablevision* court's focus on the potential audience of each particular transmission would essentially read out the "different times" language, since individuals will not typically receive the same transmission at different times. But Nimmer's solution–aggregating private transmissions when those transmissions are generated from the same copy–provides a way to reconcile the "different times" language of the Clause.

1    transmission was therefore not made "to the public" within the meaning of the Transmit Clause

2    and did not infringe the plaintiffs' public performance right. *Id.* at 138.

3         We discuss *Cablevision*'s interpretation of the Transmit Clause in such detail because

4    that decision establishes four guideposts that determine the outcome of this appeal. First and

5    most important, the Transmit Clause directs courts to consider the potential audience of the

6    individual transmission. *See id.* at 135. If that transmission is "capable of being received by the

7    public" the transmission is a public performance; if the potential audience of the transmission is

8    only one subscriber, the transmission is not a public performance, except as discussed below.

9    Second and following from the first, private transmissions–that is those not capable of being

10   received by the public–should not be aggregated. It is therefore irrelevant to the Transmit Clause

11   analysis whether the public is capable of receiving the same underlying work or original

12   performance of the work by means of many transmissions. *See id.* at 135-37. Third, there is an

13   exception to this no-aggregation rule when private transmissions are generated from the same

14   copy of the work. In such cases, these private transmissions *should* be aggregated, and if these

15   aggregated transmissions from a single copy enable the public to view that copy, the

16   transmissions are public performances. *See id.* at 137-38. Fourth and finally, "any factor that

17   limits the *potential* audience of a transmission is relevant" to the Transmit Clause analysis. *Id.* at

18   137.

19   **III.    *Cablevision*'s Application to Aereo's System**

20        As discussed above, *Cablevision*'s holding that Cablevision's transmissions of programs

21   recorded with its RS-DVR system were not public performances rested on two essential facts.

1    First, the RS-DVR system created unique copies of every program a Cablevision customer

2    wished to record. 536 F.3d at 137. Second, the RS-DVR's transmission of the recorded program

3    to a particular customer was generated from that unique copy; no other customer could view a

4    transmission created by that copy. *Id.* Given these two features, the potential audience of every

5    RS-DVR transmission was only a single Cablevision subscriber, namely the subscriber who

6    created the copy.[12] And because the potential audience of the transmission was only one

7    Cablevision subscriber, the transmission was not made "to the public."

8        The same two features are present in Aereo's system. When an Aereo customer elects to

9    watch or record a program using either the "Watch" or "Record" features, Aereo's system

10    creates a unique copy of that program on a portion of a hard drive assigned only to that Aereo

11    user. And when an Aereo user chooses to watch the recorded program, whether (nearly) live or

12    days after the program has aired, the transmission sent by Aereo and received by that user is

13    generated from that unique copy. No other Aereo user can ever receive a transmission from that

14    copy. Thus, just as in *Cablevision*, the potential audience of each Aereo transmission is the

15    single user who requested that a program be recorded.

16        Plaintiffs offer various arguments attempting to distinguish *Cablevision* from the Aereo

17    system. First, they argue that *Cablevision* is distinguishable because Cablevision had a license to

18    transmit programming in the first instance, namely when it first aired the programs; thus the

19    question was whether Cablevision needed an additional license to retransmit the programs

---

[12]The *Cablevision* court concluded in its discussion of the reproduction right that
Cablevision's customers, not Cablevision, "made" the RS-DVR copies. *See* 536 F.3d at 133.

23

1   recorded by its RS-DVR system. Aereo, by contrast, has no license. This argument fails, as the

2   question is whether Aereo's transmissions are public performances of the Plaintiffs' copyrighted

3   works. If so, Aereo needs a license to make such public performances; if they are not public

4   performances, it needs no such license. Thus whether Aereo has a license is not relevant to

5   whether its transmissions are public and therefore must be licensed. This argument by the

6   Plaintiffs also finds no support in the *Cablevision* opinion. *Cablevision* did not hold that

7   Cablevision's RS-DVR transmissions were *licensed* public performances; rather it held they

8   were not public performances. It does not appear that the *Cablevision* court based its decision

9   that Cablevision's RS-DVR transmissions were non-public transmissions on Cablevision's

10  license to broadcast the programs live. Indeed, such a conclusion would have been erroneous,

11  because having a license to publicly perform a work in a particular instance, such as to broadcast

12  a television program live, does not give the licensee the right to perform the work again. That

13  Cablevision had a license to transmit copyrighted works when they first aired thus should have

14  no bearing on whether it needed a license to retransmit these programs as part of its RS-DVR

15  system. Indeed, if this interpretation of *Cablevision* were correct, Cablevision would not need a

16  license to retransmit programs using video-on-demand and there would have been no reason for

17  Cablevision to construct an RS-DVR system employing individual copies.

18      Second, Plaintiffs argue that discrete transmissions should be aggregated to determine

19  whether they are public performances. This argument has two aspects. Plaintiffs first argue that

20  because Aereo's discrete transmissions enable members of the public to receive "the same

21  performance (i.e., Aereo's retransmission of a program)" they are transmissions made "to the

1    public." Br. of Pls.-Appellants Am. Broad. Cos., et al. at 19. But this is nothing more than the

2    *Cablevision* plaintiffs' interpretation of the Transmit Clause, as it equates Aereo's transmissions

3    with the original broadcast made by the over-the-air network rather than treating Aereo's

4    transmissions as independent performances. *See* 536 F.3d at 136. This approach was explicitly

5    rejected by the *Cablevision* court. *See id.*

6           Plaintiffs also argue that the Copyright Act requires that all of Aereo's discrete

7    transmissions "be aggregated and viewed collectively as constituting a public performance." Br.

8    of Pls.-Appellants WNET, Thirteen, et al. at 34. This is not contrary to *Cablevision*, they argue,

9    because *Cablevision* only held that transmissions of the same performance or work made by

10    different entities should not be aggregated. On their view, discrete transmissions of the same

11    performance or work made by the same entity should be aggregated to determine whether a

12    public performance has occurred. This argument is also foreclosed by *Cablevision*. First,

13    *Cablevision* made clear that the relevant inquiry under the Transmit Clause is the potential

14    audience of a particular transmission, not the potential audience for the underlying work or the

15    particular performance of that work being transmitted. *See* 536 F.3d at 135. But the only reason

16    to aggregate Aereo's discrete transmissions along the lines suggested by Plaintiffs is that they

17    are discrete transmissions *of the same performance or work*. Thus Plaintiffs are asking us to

18    adopt a reading of the Transmit Clause that is contrary to that adopted by *Cablevision* because it

19    focuses on the potential audience of the performance or work being transmitted, not the potential

20    audience of the particular transmission. Second, Plaintiffs provide no reason why Aereo's

21    multiple, audience-of-one transmissions of unique copies of the same underlying program should

1    be aggregated but not Cablevision's multiple, audience-of-one transmissions of unique copies of

2    the same underlying program. Both Aereo and Cablevision are making multiple private

3    transmissions of the same work, so adopting the Plaintiffs' approach and aggregating all

4    transmissions made by the same entity would require us to find that both are public

5    performances. While it does not appear that *Cablevision* explicitly rejected this view,

6    interpreting the Transmit Clause as the Plaintiffs urge so as to aggregate Aereo's transmissions

7    would, if fairly applied to the facts of *Cablevision*, require us to aggregate Cablevision's distinct

8    RS-DVR transmissions. For these reasons, we cannot accept Plaintiffs' arguments that Aereo's

9    transmissions to a single Aereo user, generated from a unique copy created at the user's request

10    and only accessible to that user, should be aggregated for the purposes of determining whether

11    they are public performances.

12          Plaintiffs' third argument for distinguishing *Cablevision* is that *Cablevision*

13    was decided based on an analogy to a typical VCR, with the RS-DVR simply an upstream

14    version, but Aereo's system is more analogous to a cable television provider. While it is true that

15    the *Cablevision* court did compare the RS-DVR system to the stand-alone VCR, these

16    comparisons occur in the section of that opinion discussing Cablevision's potential liability for

17    infringing the plaintiffs' reproduction right. *See* 536 F.3d at 131. No part of *Cablevision*'s

18    analysis of the public performance right appears to have been influenced by any analogy to the

19    stand-alone VCR. Moreover, this Court has followed *Cablevision*'s interpretation of the

20    Transmit Clause in the context of internet music downloads. *See United States v. Am. Soc'y of*

21    *Composers, Authors & Publishers*, 627 F.3d 64, 73-76 (2d Cir. 2010) ("*ASCAP*"); *see also*

1    *United States v. Am. Soc'y of Composers, Authors & Publishers (Application of Cellco P'Ship)*,

2    663 F. Supp. 2d 363, 371-74 (S.D.N.Y. 2009) (following *Cablevision*'s analysis of the Transmit

3    Clause in the context of cellphone ringtones). Thus we see no support in *Cablevision* or in this

4    Court's subsequent decisions for the Plaintiffs' argument that *Cablevision*'s interpretation of the

5    Transmit Clause is confined to technologies similar to the VCR.[13]

6         Plaintiffs' fourth argument for distinguishing *Cablevision* is that Cablevision's RS-DVR

7    copies "broke the continuous chain of retransmission to the public" in a way that Aereo's copies

8    do not. Br. of Pls.-Appellants Am. Broad. Cos., et al. at 39. Specifically, they argue that Aereo's

9    copies are merely a device by which Aereo enables its users to watch nearly live TV, while

10   Cablevision's copies, by contrast, could only serve as the source for a transmission of a program

11   after the original transmission, that is the live broadcast of the program, had finished. As a result,

12   Aereo's copies lack the legal significance of Cablevision's RS-DVR copies and are no different

13   from the temporary buffer copies created by internet streaming, a process that this Court has

14   assumed produces public performances. *See, e.g.*, *ivi*, 691 F.3d at 278; *ASCAP*, 627 F.3d at 74.

15        This argument fails for two reasons. First, Aereo's copies do have the legal significance

16   ascribed to the RS-DVR copies in *Cablevision* because the user exercises the same control over

17   their playback. The Aereo user watching a copy of a recorded program that he requested be

18   created, whether using the "Watch" feature or the "Record" feature, chooses when and how that

19   copy will be played back. The user may begin watching it nearly live, but then pause or rewind

---

[13]And even if such analogies were probative, Aereo's system could accurately be analogized to an upstream combination of a standard TV antenna, a DVR, and a Slingbox.

1    it, resulting in playback that is no longer concurrent with the program's over-the-air broadcast.

2    Or the user may elect not to begin watching the program at all until long after it began airing.

3    This volitional control over how the copy is played makes Aereo's copies unlike the temporary

4    buffer copies generated incident to internet streaming. A person watching an internet stream

5    chooses the program he wishes to watch and a temporary buffer copy of that program is then

6    created, which serves as the basis of the images seen by the person watching the stream. But that

7    person cannot exercise any control over the manner in which that copy is played–it cannot be

8    paused, rewound, or rewatched later. As a result, the imposition of a temporary buffer copy

9    between the outgoing stream and the image seen by the person watching it is of no significance,

10   because the person only exercises control *before* the copy is created in choosing to watch the

11   program in the first place. By contrast, the Aereo user selects what program he wishes a copy to

12   be made of and then controls when and how that copy is played.[14] This second layer of control,

13   exercised *after* the copy has been created, means that Aereo's transmissions from the recorded

---

[14]It is true that an Aereo user in "Watch" mode will often not exercise volitional control over the playback of the program, because the program will automatically begin playing when selected and he will watch it through to the end. But that is not significant because the Aereo user can exercise such control if he wishes to, which means that the copy Aereo's system generates is not merely a technical link in a process of transmission that should be deemed a unity transmission. Moreover, the "Watch" feature's automatic playback is merely a default rule. The user can accomplish the same thing by using the "Record" feature, save that he must take the additional step of pressing "Play" once enough of the program has been recorded for playback. If this additional step were sufficient to break the chain of transmission, we see no reason why the "Watch" feature's default in favor of playback should change our analysis.

1     copies cannot be regarded as simply one link in a chain of transmission, giving Aereo's copies

2     the same legal significance as the RS-DVR copies in *Cablevision*.[15]

3         Second, Plaintiffs' argument fails to account for Aereo's user-specific antennas. Each

4     user-associated copy of a program created by Aereo's system is generated from a unique antenna

5     assigned only to the user who requested that the copy be made. The feed from that antenna is not

6     used to generate multiple copies of each program for different Aereo users but rather only one

7     copy: the copy that can be watched by the user to whom that antenna is assigned. Thus even if

8     we were to disregard Aereo's copies, it would still be true that the potential audience of each of

9     Aereo's transmissions was the single user to whom each antenna was assigned. It is beyond

10    dispute that the transmission of a broadcast TV program received by an individual's rooftop

11    antenna to the TV in his living room is private, because only that individual can receive the

12    transmission from that antenna, ensuring that the potential audience of that transmission is only

13    one person. Plaintiffs have presented no reason why the result should be any different when that

---

[15]We also note that the Aereo system's use of copies gives it two features that would not be present were it simply to transmit the television programs its antennas receive directly to the user. First, it allows the Aereo user to pause and rewind seemingly live TV. This is because while the Aereo user has been watching the program "live," Aereo's system has in fact been creating a complete copy of the program. Thus if the user wishes to rewind thirty seconds or to the beginning of the program, he can easily do so. Second, if a user in "Watch" mode decides during a program he has been watching that he would like to save the program for later viewing, he can simply press the "Record" button. When the user does this, the entire program from the time he first began watching it is saved, not merely the portion beginning from the time when he pressed "Record." Were Aereo to transmit the signal from its antennas directly to each Aereo customers, neither of these features would be possible, because the image seen by the customer would be generated from a live feed, not a copy of the program. Aereo's users may well regard these two features as valuable and they provide an additional reason for regarding Aereo's copies as legally significant and not merely technical artifacts of a system to transmit live TV.

1    rooftop antenna is rented from Aereo and its signals transmitted over the internet: it remains the

2    case that only one person can receive that antenna's transmissions.[16] Thus even without the

3    creation of user-associated copies, which under *Cablevision* means that Aereo's transmissions

4    are not public, there is significant reason to believe that Aereo's system would not be creating

5    public performances, since the entire chain of transmission from the time a signal is first

6    received by Aereo to the time it generates an image the Aereo user sees has a potential audience

7    of only one Aereo customer.[17]

8         Finally, Plaintiffs argue that holding that Aereo's transmissions are not public

9    performances exalts form over substance, because the Aereo system is functionally equivalent to

10    a cable television provider. Plaintiffs also make much of the undisputed fact that Aereo's system

11    was designed around the *Cablevision* holding, because it creates essentially identical copies of

12    the same program for every user who wishes to watch it in order to avoid copyright liability,

---

[16]This makes Aereo's system unlike the early cable TV systems at issue in *Fortnightly,* 392 U.S. 390, and *Teleprompter*, 415 U.S. 394, because the signals from those community TV antennas were shared among many users. When Congress drafted the 1976 Copyright Act, it intended that such transmissions be deemed public performances. But, as discussed below, Congress clearly believed that, under the terms of the Act, some transmissions were private. The methodology Congress proscribed for distinguishing between public and private transmissions is the size of the potential audience, and by that methodology, the feed from Aereo's antennas is a private transmission because it results in a performance viewable by only one user. The 1976 Congress may not have anticipated that later technology would make it possible to mimic the functionality of early cable TV by means of private transmissions, but that unexpected result does not change the language of the statute.

[17]Because Aereo's system uses both user-associated antennas and user-associated copies, we need not decide whether a system with only one of these attributes would be publicly performing copyrighted works.

1   instead of using a perhaps more efficient design employing shared copies. However, that Aereo

2   was able to design a system based on *Cablevision*'s holding to provide its users with nearly live

3   television over the internet is an argument that *Cablevision* was wrongly decided; it does not

4   provide a basis for distinguishing *Cablevision*. Moreover, Aereo is not the first to design systems

5   to avoid copyright liability. The same is likely true of Cablevision, which created separate user-

6   associated copies of each recorded program for its RS-DVR system instead of using more

7   efficient shared copies because transmissions generated from the latter would likely be found to

8   infringe copyright holders' public performance right under the rationale of *Redd Horne*, 749

9   F.2d 154. Nor is Aereo alone in designing its system around *Cablevision*, as many cloud

10  computing services, such as internet music lockers, discussed further below, appear to have done

11  the same. *See* Br. of the Computer & Commc'ns Indus. Ass'n & the Internet Ass'n as Amicus

12  Curiae at 5-8. Perhaps the application of the Transmit Clause should focus less on the technical

13  details of a particular system and more on its functionality, but this Court's decisions in

14  *Cablevision* and *NFL*, 211 F.3d 10, held that technical architecture matters.

15  **IV.   The Legislative Intent Behind the 1976 Copyright Act**

16          Plaintiffs also contend that the legislative history of the 1976 Copyright Act shows that

17  Aereo's transmissions should be deemed public performances of the Plaintiffs' copyrighted

18  works. They argue that cable retransmissions are public performances under the Transmit Clause

19  and Aereo is functionally equivalent to a cable system. However, this reading of the legislative

20  history is simply incompatible with the conclusions of the *Cablevision* court.

1          This view of the legislative history also ignores a contrary strand of the history behind

2     the 1976 Copyright Act. Congress recognized when it drafted the 1976 Act that its broad

3     definition of "performance" could create unintended results. The House Report states that under

4     this definition, "any individual is performing whenever he or she plays a phonorecord

5     embodying the performance or communicates the performance by turning on a receiving set."

6     House Report at 63. But because Congress did not wish to require everyone to obtain a license

7     from copyright holders before they could "perform" the copyrighted works played by their

8     television, Congress was careful to note that a performance "would not be actionable as an

9     infringement unless it were done 'publicly,' as defined in section 101." *id.* "Private"

10    performances are exempted from copyright liability. *Id.* This limitation also applies to

11    performances created by a "transmission," since, as the *Cablevision* court noted, if Congress

12    intended all transmissions to be public performances, the Transmit Clause would not have

13    contained the phrase "to the public."[18] *Cablevision*, 536 F.3d at 135-36.

14         In the technological environment of 1976, distinguishing between public and private

15    transmissions was simpler than today. New devices such as RS-DVRs and Slingboxes

16    complicate our analysis, as the transmissions generated by these devices can be analogized to the

17    paradigmatic example of a "private" transmission: that from a personal roof-top antenna to a

---

[18]This is particularly appropriate given that in 1976, when cable TV was still in its infancy, many Americans used rooftop antennas. Thus Congress would have certainly wished to avoid adopting language that would make millions of Americans copyright infringers because they transmitted broadcast television programs from their personal rooftop antennas to their own television sets.

1    television set in a living room. As much as Aereo's service may resemble a cable system, it also

2    generates transmissions that closely resemble the private transmissions from these devices. Thus

3    unanticipated technological developments have created tension between Congress's view that

4    retransmissions of network programs by cable television systems should be deemed public

5    performances and its intent that some transmissions be classified as private. Although Aereo may

6    in some respects resemble a cable television system, we cannot disregard the contrary concerns

7    expressed by Congress in drafting the 1976 Copyright Act. And we certainly cannot disregard

8    the express language Congress selected in doing so. That language and its legislative history, as

9    interpreted by this Court in *Cablevision*, compels the conclusion that Aereo's transmissions are

10    not public performances.

11    **V.**    **Stare Decisis**

12           Though presented as efforts to distinguish *Cablevision*, many of Plaintiffs' arguments

13    really urge us to overrule *Cablevision*. One panel of this Court, however, "cannot overrule a

14    prior decision of another panel." *Union of Needletrades, Indus. & Textile Employees, AFL-CIO,*

15    *CLC v. U.S. I.N.S.*, 336 F.3d 200, 210 (2d Cir. 2003). We are "bound by the decisions of prior

16    panels until such time as they are overruled either by an en banc panel of our Court or by the

17    Supreme Court." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). There is an

18    exception when an intervening Supreme Court decision "casts doubt on our controlling

19    precedent," *Union of Needletrades*, 336 F.3d at 210, but we are unaware of any such decisions

20    that implicate *Cablevision*. Plaintiffs have provided us with no adequate basis to distinguish

1    *Cablevision* from the Aereo system.[19] We therefore see no error in the district court's conclusion

2    that Plaintiffs are unlikely to prevail on the merits.

3    **VI.    The Other Preliminary Injunction Factors**

4    We now turn to the remaining preliminary injunction factors. *See Salinger*, 607 F.3d at

5    79-80. Because the Plaintiffs are not likely to prevail on the merits, we consider whether the

6    Plaintiffs have demonstrated "sufficiently serious questions going to the merits to make them a

7    fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor." *Id.*

8    at 79. Given our conclusion that Aereo's service does not infringe Plaintiffs' public performance

9    right when it transmits a program still airing on broadcast television, we do not believe the

10    Plaintiffs have demonstrated "sufficiently serious questions going to the merits to make them a

11    fair ground for litigation." *Id.*

12    Moreover, we find no abuse of discretion in the district court's determination that the

13    balance of hardships does not tip decidedly in the Plaintiffs' favor. The district court reached this

14    decision based on its conclusions (1) that the Plaintiffs were likely to suffer irreparable harm in

15    the absence of an injunction and (2) that Aereo would suffer significant hardship if an injunction

---

[19]Stare decisis is particularly warranted here in light of substantial reliance on *Cablevision*. As mentioned above, it appears that many media and technology companies have relied on *Cablevision* as an authoritative interpretation of the Transmit Clause. One example is cloud media services, which have proliferated in recent years. These services, which allow their users to store music on remote hard drives and stream it to internet-connected devices, have apparently been designed to comply with *Cablevision*. Just like Aereo's system and Cablevision's RS-DVR, they seek to avoid public performance liability by creating user-associated copies of each song rather than sharing song files among multiple users. *See* Brandon J. Trout, Note, *Infringers or Innovators? Examining Copyright Liability for Cloud-Based Music Locker Services*, 14 Vand. J. Ent. & Tech. L. 729, 746-48 (2012).

1    should issue, since this would likely be the end of its business. *See Am. Broad. Cos., Inc. v.*

2    *Aereo*, 874 F. Supp. 2d at 397-403. The parties do not appear to contest the district court's

3    factual determinations supporting these conclusions and we see no clear error in them. Plaintiffs

4    do argue that any harm suffered by Aereo should be disregarded in the balance of hardships

5    analysis because Aereo's business is illegal and "[i]t is axiomatic that an infringer of copyright

6    cannot complain about the loss of ability to offer its infringing product." *ivi*, 691 F.3d at 287. But

7    this argument hinges on the conclusion that Aereo's business infringes the Plaintiffs' copyrights.

8    Because we conclude that it does not–at least on the limited question before us of whether

9    Aereo's transmissions of unique copies of recorded programs to the Aereo users who directed

10    that they be created are public performances–the harms Aereo would suffer from an injunction

11    are legally cognizable and significant. There is thus no reason to disturb the district court's

12    conclusion that the balance of hardships does not tip "decidedly" in the Plaintiffs' favor.

## CONCLUSION

14        We conclude that Aereo's transmissions of unique copies of broadcast television

15    programs created at its users' requests and transmitted while the programs are still airing on

16    broadcast television are not "public performances" of the Plaintiffs' copyrighted works under

17    *Cablevision*. As such, Plaintiffs have not demonstrated that they are likely to prevail on the

18    merits on this claim in their copyright infringement action. Nor have they demonstrated serious

19    questions as to the merits and a balance of hardships that tips decidedly in their favor. We

20    therefore affirm the order of the district court denying the Plaintiffs' motion.

CHIN, *Circuit Judge*:

I respectfully dissent.

Defendant-appellee Aereo, Inc. ("Aereo") captures over-the-air broadcasts of television programs and retransmits them to subscribers by streaming them over the Internet. For a monthly fee, Aereo's customers may "Watch" the programming "live" (that is, with a seven-second delay) on their computers and other electronic devices, or they may "Record" the programs for later viewing. Aereo retransmits the programming without the authorization of the copyright holders and without paying a fee.

The Copyright Act confers upon owners of copyrights in audiovisual works the exclusive right "to perform the copyrighted work publicly." 17 U.S.C. § 106(4). This exclusive right includes the right "to transmit or otherwise communicate a performance . . . to the public, by means of any device or process." *Id.* § 101. In my view, by transmitting (or retransmitting) copyrighted programming to the public without authorization, Aereo is engaging in copyright infringement in clear violation of the Copyright Act.

Aereo argues that it is not violating the law because its transmissions are not "public" performances; instead, the argument goes, its transmissions are "private" performances, and a "private performance is not copyright infringement."  It contends that it is merely providing a "technology platform that enables consumers to use remotely-located equipment . . . to create, access and view their own unique recorded copies of free over-the-air broadcast television programming."

Aereo's "technology platform" is, however, a sham. The system employs thousands of individual dime-sized antennas, but there is no technologically sound reason to use a multitude of tiny individual antennas rather than one central antenna; indeed, the system is a Rube Goldberg-like contrivance, over-engineered in an attempt to avoid the reach of the Copyright Act and to take advantage of a perceived loophole in the law.  After capturing the broadcast signal, Aereo makes a copy of the selected program for each viewer, whether the user chooses to "Watch" now or "Record" for later.  Under Aereo's theory, by using these

individual antennas and copies, it may retransmit, for

example, the Super Bowl "live" to 50,000 subscribers and

yet, because each subscriber has an individual antenna and a

"unique recorded cop[y]" of the broadcast, these are

"private" performances.  Of course, the argument makes no

sense.  These are very much *public* performances.

Aereo purports to draw its infringement-avoidance

scheme from this Court's decision in *Cartoon Network LP v.*

*CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), *cert.*

*denied*, 129 S. Ct. 2890 (2009) ("*Cablevision*").  But, as

discussed below, there are critical differences between

*Cablevision* and this case.  Most significantly, *Cablevision*

involved a cable company that paid statutory licensing and

retransmission consent fees for the content it

retransmitted, while Aereo pays no such fees.  Moreover, the

subscribers in *Cablevision* already had the ability to view

television programs in real-time through their *authorized*

cable subscriptions, and the remote digital video recording

service at issue there was a supplemental service that

allowed subscribers to store that authorized content for

-3-

later viewing.  In contrast, no part of Aereo's system is
authorized.  Instead, its storage and time-shifting
functions are an integral part of an unlicensed
retransmission service that captures broadcast television
programs and streams them over the Internet.

Aereo is doing precisely what cable companies,
satellite television companies, and authorized Internet
streaming companies do -- they capture over-the-air
broadcasts and retransmit them to customers -- except that
those entities are doing it legally, pursuant to statutory
or negotiated licenses, for a fee.  By accepting Aereo's
argument that it may do so without authorization and without
paying a fee, the majority elevates form over substance.
Its decision, in my view, conflicts with the text of the
Copyright Act, its legislative history, and our case law.

For these and other reasons discussed more fully
below, I would reverse the district court's order denying
plaintiffs-appellants' motion for a preliminary injunction.

## *DISCUSSION*

When interpreting a statute, we must begin with the plain language, giving any undefined terms their ordinary meaning. *See Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1356 (2012); *United States v. Desposito*, 704 F.3d 221, 226 (2d Cir. 2013). We must "attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Pettus v. Morgenthau*, 554 F.3d 293, 297 (2d Cir. 2009). Where Congress has expressed its intent in "reasonably plain terms, that language must ordinarily be regarded as conclusive." *Negonsott v. Samuels*, 507 U.S. 99, 104 (1993) (internal quotation marks and citation omitted); *see Devine v. United States*, 202 F.3d 547, 551 (2d Cir. 2000). If we conclude that the text is ambiguous, however, we will look to legislative history and other tools of statutory interpretation to "dispel this ambiguity." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 697 F.3d 154, 159 (2d Cir. 2012).

I begin, then, by considering the text of the relevant sections of the Copyright Act. To the extent there

is any arguable ambiguity in the statutory language, I next
turn to its legislative history.  Finally, I conclude with a
discussion of *Cablevision* as well as other relevant
precedents.

**A.    *The Statutory Text***

Section 106 of the Copyright Act sets out six
exclusive rights held by a copyright owner; these include
the right "to perform the copyrighted work publicly."  17
U.S.C. § 106(4).

As defined in section 101, "[t]o perform . . . a
work 'publicly' means," among other things:

> to transmit or otherwise communicate a
> performance or display of the work . . .
> to the public, by means of any device or
> process, whether the members of the
> public capable of receiving the
> performance or display receive it in the
> same place or in separate places and at
> the same time or at different times.

*Id.* § 101.  "To 'transmit' a performance" is "to communicate
it by any device or process whereby images or sounds are
received beyond the place from which they are sent."  *Id.*
Hence, the use of a device or process to transmit or

-6-

communicate copyrighted images or sounds to the public

constitutes a public performance, whether members of the

public receive the performance in the same place or in

different places, whether at the same time or at different

times.

It is apparent that Aereo's system fits squarely

within the plain meaning of the statute. *See, e.g.*, *Fox

Television Stations, Inc. v. BarryDriller Content Sys., PLC*,

No. CV 12-6921, 2012 WL 6784498, at *1-6 (C.D. Cal. Dec. 27,

2012) (holding that a service "technologically analogous" to

Aereo's was engaged in public performances).  The statute is

broadly worded, as it refers to "*any* device or process."  17

U.S.C. § 101 (emphasis added); *see also id.* (defining

"device" and "process" as "one now known or later

developed").  Aereo's system of thousands of antennas and

other equipment clearly is a "device or process."  Using

that "device or process," Aereo receives copyrighted images

and sounds and "transmit[s] or otherwise communicate[s]"

them to its subscribers "beyond the place from which they

are sent," *id.*, that is, "'beyond the place' of

origination," *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 866 F.2d 278, 282 (9th Cir. 1989). The "performance or display of the work" is then received by paying subscribers "in separate places" and "at different times." 17 U.S.C. § 101.

Even assuming Aereo's system limits the potential audience for each transmission, and even assuming each of its subscribers receives a unique recorded copy, Aereo still is transmitting the programming "to the public." *Id.* Giving the undefined term "the public" its ordinary meaning, *see Kouichi Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012), a transmission to anyone other than oneself or an intimate relation is a communication to a "member[] of the public," because it is not in any sense "private." *See* Webster's II: New Riverside University Dictionary 951 (1994) (defining "public" as "[t]he community or the people as a group"); *see also id.* at 936 (defining "private" as, inter alia, "[n]ot public: intimate"). *Cf. Cablevision*, 536 F.3d at 138 ("[T]he identity of the transmitter . . . [is] germane in determining whether that

-8-

transmission is made 'to the public.'"); *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 299-300 (3d Cir. 1991) (construing "to the public" in section 106(3) and concluding that "even one person can be the public").

What Aereo is doing is not in any sense "private," as the Super Bowl example discussed above illustrates. This understanding accords with the statute's instruction that a transmission can be "to the public" even if the "members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101. Because Aereo is transmitting television signals to paying strangers, all of its transmissions are "to the public," even if intervening "device[s] or process[es]" limit the potential audience of each separate transmission to a single "member[] of the public." *Id.*

By any reasonable construction of the statute, Aereo is engaging in public performances and, therefore, it is engaging in copyright infringement. *See id.* §§ 106(4), 501(a).

**B.    *The Legislative History***

Even if the language of the transmit clause were ambiguous as applied to Aereo's system, *see Cablevision*, 536 F.3d at 136 ("[T]he transmit clause is not a model of clarity . . . ."), the legislative history reinforces the conclusion that Aereo is engaging in public performances. The legislative history makes clear that Congress intended to reach new technologies, like this one, that are designed solely to exploit someone else's copyrighted work.

Just before the passage of the 1976 Copyright Act, the Supreme Court held in *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968), and *Teleprompter Corp. v. Columbia Broadcast Systems, Inc.*, 415 U.S. 394 (1974), that community antenna television ("CATV") systems -- which captured live television broadcasts with antennas set on hills and retransmitted the signals to viewers unable to receive the original signals -- did not infringe the public performance right because they were not "performing" the copyrighted work. *See Teleprompter*, 415 U.S. at 408-09; *Fortnightly*, 392 U.S. at 399-400. In reaching this conclusion, the Court reasoned that:

-10-

> If an individual erected an antenna on a
> hill, strung a cable to his house, and
> installed the necessary amplifying
> equipment, he would not be 'performing'
> the programs he received on his
> television set. . . .  The only
> difference in the case of CATV is that
> the antenna system is erected and owned
> not by its users but by an entrepreneur.

*Fortnightly*, 392 U.S. at 400.  This rationale is nearly

identical to the justification advanced by Aereo:  each

subscriber could legally use his own antenna, digital video

recorder ("DVR"), and Slingbox[1] to stream live television to

his computer or other device, and so it makes no legal

difference that the system is actually "erected and owned

not by its users but by an entrepreneur."  *Id.*[2]

---

[1]    A "Slingbox" is a set-top box that permits consumers to shift their television programming to their portable devices. Slingbox describes its service as "placeshifting": "Placeshifting is viewing and listening to live, recorded or stored media on a remote device over the Internet or a data network.  Placeshifting allows consumers to watch their TV anywhere."  *See Placeshifting*, Slingbox.com, http://www.slingbox.com/get/placeshifting (last visited March 5, 2013).  The Slingbox thus enables a consumer to view on a remote device content that he is already entitled to receive from a licensed cable company or other authorized source to view on his television.

[2]    Aereo's contention that each subscriber has an individual antenna is a fiction because the vast majority of its subscribers are "dynamic users" who are randomly assigned an antenna each time they use the system.  Although each antenna is used only by one person at a time, it will be randomly assigned to another person for the next use.  In other words, this is a shared pool of antennas, not individually-designated antennas.

-11-

But Congress expressly rejected the outcome
reached by the Supreme Court in *Fortnightly* and
*Teleprompter*.  *See Capital Cities Cable, Inc. v. Crisp*, 467
U.S. 691, 709 (1984) ("Congress concluded that cable
operators should be required to pay royalties to the owners
of copyrighted programs retransmitted by their systems on
pain of liability for copyright infringement.")*; see also
WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 281 (2d Cir. 2012);
*Fox Television Stations*, 2012 WL 6784498, at *5.  In the
1976 Copyright Act, Congress altered the definitions of
"perform" and "publicly" specifically to render the CATV
systems' unlicensed retransmissions illegal.  *See Sony Corp.
of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 469
n.17 (1984); H.R. Rep. No. 94-1476, at 63, *reprinted in* 1976
U.S.C.C.A.N. 5659, 5676-77 ("[A] cable television system is
performing when it retransmits the broadcast to its
subscribers . . . ."); *id.* at 64, *reprinted in* 1976
U.S.C.C.A.N. at 5678 ("Clause (2) of the definition of
'publicly' in section 101 makes clear that the concept[] of
public performance . . . include[s] . . . acts that transmit

-12-

or otherwise communicate a performance or display of the
work to the public . . . .").

          Congress was not only concerned, however, with the
then newly-emerging CATV systems.  Recognizing that the
*Fortnightly* and *Teleprompter* decisions arose in part because
of the "drastic technological change" after the 1909 Act,
*Fortnightly*, 392 U.S. at 396, Congress broadly defined the
term "transmit" to ensure that the 1976 Act anticipated
future technological developments:

>     The definition of 'transmit' . . . is
>     broad enough to include all conceivable
>     forms and combinations of wires and
>     wireless communications media, including
>     but by no means limited to radio and
>     television broadcasting as we know them.
>     Each and every method by which the images
>     or sounds comprising a performance or
>     display are picked up and conveyed is a
>     'transmission,' and if the transmission
>     reaches the public in [any] form, the
>     case comes within the scope of clauses
>     (4) or (5) of section 106.

H.R. Rep. No. 94-1476, at 64, *reprinted in* 1976 U.S.C.C.A.N.
at 5678.  Further anticipating that there would be changes
in technology that it could not then foresee, Congress added
that a public performance could be received in different

-13-

places and at different times.  This change was meant to
clarify that:

> a performance made available by
> transmission to the public at large is
> 'public' even though the recipients are
> not gathered in a single place, and even
> if there is no proof that any of the
> potential recipients was operating his
> receiving apparatus at the time of the
> transmission.  The same principles apply
> whenever *the potential recipients of the*
> *transmission represent a limited segment*
> *of the public*, such as the occupants of
> hotel rooms or the *subscribers of a cable*
> *television service*.

*Id.* at 64-65, *reprinted at* 1976 U.S.C.C.A.N. at 5678
(emphasis added).

    While Congress in 1976 might not have envisioned
the precise technological innovations employed by Aereo
today, this legislative history surely suggests that
Congress could not have intended for such a system to fall
outside the definition of a public performance.  To the
contrary, Congress made clear its intent to include within
the transmit clause "all conceivable forms and combinations
of wires and wireless communications media," and if, as
here, "the transmission reaches the public in [any] form,

-14-

the case comes within the scope of clauses (4) or (5) of

section 106." H.R. Rep. No. 94-1476, at 64, *reprinted in*

1976 U.S.C.C.A.N. at 5678. Aereo's streaming of television

programming over the Internet is a public performance as

Congress intended that concept to be defined.

## C. *Cablevision*

Aereo seeks to avoid the plain language of the

Copyright Act and the clear import of its legislative

history by relying on this Court's decision in *Cablevision*.

That reliance, in my view, is misplaced.

Cablevision was a cable operator with a license to

retransmit broadcast and cable programming to its paying

subscribers. *See Cablevision*, 536 F.3d at 123-25; *Twentieth

Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F.

Supp. 2d 607, 610 (S.D.N.Y. 2007), *rev'd sub nom.*, *Cartoon

Network LP v. CSC Holdings, Inc.* (*Cablevision*), 536 F.3d 121

(2d Cir. 2008). The content providers sought to enjoin

Cablevision from introducing a new Remote Storage DVR system

(the "RS-DVR") that would "allow[] Cablevision customers who

do not have a stand-alone DVR to record cable programming"

-15-

and "then receive playback of those programs through their home television sets." *Cablevision*, 536 F.3d at 124.  The lawsuit challenged only whether Cablevision needed additional licenses to allow its subscribers to record shows and play them back later through the RS-DVR system.  *See Twentieth Century Fox*, 478 F. Supp. 2d at 609.  If subscribers wanted to watch "live" television, they would watch it through Cablevision's licensed retransmission feed.  *See Cablevision*, 536 F.3d at 124 (explaining that Cablevision split its programming data stream, sending one "immediately to customers as before"); Amicus Br. of Cablevision Sys. Corp. at 20.

        The RS-DVR worked as follows.  Cablevision split its licensed data stream, and sent a stream to a remote server, where the data went through two buffers.  *Cablevision*, 536 F.3d at 124.  At the first buffer, the system made a temporary copy of 0.1 seconds of programming while it inquired whether any subscribers wanted to copy that programming.  *Id.*  A customer could make such a request "by selecting a program in advance from an on-screen guide,

-16-

or by pressing the record button while viewing a given
program." *Id.* at 125.  If a request had been made, the data
moved to the second buffer and then was permanently saved
onto a portion of a hard drive designated for that customer.
*Id.* at 124.  At the customer's request, the permanent copy
was transmitted to the customer and played back to him.  *Id.*
at 125.

    *Cablevision* held that the RS-DVR did not infringe
either the reproduction or the public performance rights.
*Id.* at 140.  Unlike the majority here, I do not think we can
view *Cablevision*'s analyses of each right in isolation.  *See*
Majority Opin., *supra*, at 18.  As *Cablevision* explained,
"the right of reproduction can reinforce and protect the
right of public performance." *Cablevision*, 536 F.3d at 138.
"Given this interplay between the various rights in this
context," *id.*, *Cablevision*'s holding that "copies produced
by the RS-DVR system are 'made' by the RS-DVR customer," *id.*
at 133, was critical to its holding that "each RS-DVR
playback transmission . . . made to a single subscriber
using a single unique copy *produced by that subscriber* . . .

-17-

[is] not [a] performance[] 'to the public,'" *id.* at 139
(emphasis added); *see also* Amicus Br. of the United States
at 17-19, *Cable News Network, Inc. v. CSC Holdings, Inc.*,
129 S. Ct. 2890 (2009), *denying cert.*, *Cartoon Network LP v.
CSC Holdings, Inc.* (*Cablevision*), 536 F.3d 121 (2d Cir.
2008) [hereinafter "U.S. *Cablevision* Amicus Br."].

 With this concept in mind, it is clear that
Aereo's system is factually distinct from Cablevision's RS-
DVR system.  First, Cablevision's RS-DVR system "exist[ed]
only to produce a copy" of material that it already had a
license to retransmit to its subscribers, *Cablevision*, 536
F.3d at 131, but the Aereo system produces copies to *enable*
it to transmit material to its subscribers.  Whereas
Cablevision promoted its RS-DVR as a mechanism for recording
and playing back programs, Aereo promotes its service as a
means for watching "live" broadcast television on the
Internet and through mobile devices.  Unlike Cablevision,
however, Aereo has no licenses to retransmit broadcast
television.  If a Cablevision subscriber wanted to use her
own DVR to record programming provided by Cablevision, she

could do so through Cablevision's licensed transmission. But an Aereo subscriber could not use her own DVR to lawfully record content received from Aereo because Aereo has no license to retransmit programming; at best, Aereo could only illegally retransmit public broadcasts from its remote antennas to the user. *See, e.g.*, *Fortnightly Corp.*, 392 U.S. at 400, *overruled by statute as recognized in*, *Capital Cities Cable,* 467 U.S. at 709; *ivi, Inc.*, 691 F.3d at 278-79; *see also* U.S. *Cablevision* Amicus Br., *supra*, at 21 (arguing that the legality of a hypothetical unlicensed system that only allowed subscribers to copy and playback content "would be suspect at best, because [the subscriber] would be . . . copying programs that he was not otherwise entitled to view").  Aereo's use of copies is essential to its ability to retransmit broadcast television signals, while Cablevision's copies were merely an optional alternative to a set-top DVR.  The core of Aereo's business is streaming broadcasts over the Internet in real-time; the addition of the record function, however, cannot legitimize the unauthorized retransmission of copyrighted content.

-19-

Second, subscribers interact with Aereo's system differently from the way Cablevision's subscribers interacted with the RS-DVR.  Cablevision subscribers were already paying for the right to watch television programs, and the RS-DVR gave them the additional option to "record" the programs.  *Cablevision*, 536 F.3d at 125.  In contrast, Aereo subscribers can choose *either* "Watch" or "Record." *Am. Broad. Cos. v. AEREO, Inc.*, 874 F. Supp. 2d 373, 377 (S.D.N.Y. 2012).  Both options initiate the same process:  a miniature antenna allocated to that user tunes to the channel; the television signal is transmitted to a hard drive; and a full-length, permanent copy is saved for that customer.  *Id.* at 377-79.  If the subscriber has opted to "Watch" the program live, the system immediately begins playing back the user's copy at the same time it is being recorded.  *Id.*  Aereo will then automatically delete the saved copy once the user is done watching the program, unless the subscriber chooses to save it.  *Id.* at 379.

These differences undermine the applicability of *Cablevision* to Aereo's system.  *Cablevision* found that the

-20-

RS-DVR was indistinguishable from a VCR or set-top DVR
because Cablevision's system "exist[ed] only to produce a
copy" and its subscribers provided the "volitional conduct"
necessary to make a copy by "ordering that system to produce
a copy of a specific program." *Cablevision*, 536 F.3d at
131; *see also* U.S. *Cablevision* Amicus Br., *supra*, at 16
(noting that *Cablevision* turned on whether RS-DVR was more
analogous to set-top DVR or video-on-demand service).  The
RS-DVR was not designed to be a substitute for viewing live
television broadcasts.  Aereo's system, however, was
designed to be precisely that.  It does not exist only, or
even primarily, to make copies; it exists to stream live
television through the Internet.  Its users can choose to
"Watch" live television instead of "Record" a program, but
the system begins to produce a full-length copy anyway
because, even under its own theory, Aereo cannot legally
retransmit a television signal to them without such a copy.[3]

---

[3]     Aereo's web page does contain a conspicuous notice
under the "Watch" button that reads, "When you press 'Watch' you
will start recording this show."  Users thus have no choice but
to record the show if they wish to watch it live, making it
unlikely that the subscribers are voluntarily "ordering that
system to produce a copy." *Cablevision*, 536 F.3d at 131.

Aereo's system is much different than a VCR or DVR --
indeed, as Aereo explains, it is an antenna, a DVR, and a
Slingbox rolled into one -- and for that reason *Cablevision*
does not control our decision here.

I note also that in *Cablevision* this Court
"emphasize[d]" that its holding "does not generally permit
content delivery networks to avoid all copyright liability
by making copies of each item of content and associating one
unique copy with each subscriber to the network, or by
giving their subscribers the capacity to make their own
individual copies."  536 F.3d at 139.  Likewise, when the
United States opposed the grant of certiorari in
*Cablevision*, it argued that "the Second Circuit's analysis
of the public-performance issue should not be understood to
reach . . . other circumstances beyond those presented."
U.S. *Cablevision* Amicus Br., *supra*, at 21.[4]  *Cablevision*

---

[4]      By opposing the grant of certiorari, the government was
not embracing *Cablevision*'s construction of the transmit clause.
To the contrary, the United States took the position that
"scattered language in the Second Circuit's decision could be
read to endorse overly broad, and *incorrect*, propositions about
the Copyright Act."  U.S. *Cablevision* Amicus Br., *supra*, at 6
(emphasis added).  Specifically, the government was concerned

should not be extended to cover the circumstances presented in this case.  Indeed, it is telling that Aereo declines to offer its subscribers channels broadcast from New Jersey, even though its antennas are capable of receiving those signals, for fear of being subject to suit outside the Second Circuit, *i.e.*, outside the reach of *Cablevision*.  *Cf. Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, No. CV 12-6921, 2012 WL 6784498, at *3-4 (C.D. Cal. Dec. 27, 2012) (declining to follow *Cablevision* and enjoining an Aereo-like system based on plain meaning of § 101).

Finally, the majority's decision in my view runs afoul of other decisions of this Court.  Although the issue was not even contested, in *ivi* we recognized that the

---

with the suggestion "that a performance is not made available 'to the public' unless more than one person is capable of receiving a *particular* transmission" because it might "undermine copyright protection in circumstances far beyond those presented here, including with respect to . . . situations in which a party streams copyrighted material on an individualized basis over the Internet." *Id.* at 20-21.  Despite these "problematic" aspects, *id.* at 22, the United States considered *Cablevision* an "unsuitable vehicle" for deciding these issues, due to the absence of any conflicting circuit court decisions at the time and the limitations imposed by the parties' stipulations, *id.* at 6.

retransmission of copyrighted television programming by
streaming it live over the Internet constituted a "public
performance" in violation of the Copyright Act.  691 F.3d at
278, 286, 287.[5]  Similarly, in *United States v. American
Society of Composers, Authors, Publishers* ("*ASCAP*"), where,
again, the issue was not even contested, we observed that
the streaming of a song, like the streaming of a "television
or radio broadcast," is a public performance.  627 F.3d 64,
74 (2d Cir. 2010) (but holding in contrast that downloads of
music do not constitute "public performances");[6] *accord*

---

[5]    There are companies in the market that stream
television programming over the Internet pursuant to licenses,
such as Hulu, Netflix, Amazon, and channel-specific websites like
ComedyCentral.com.  *See* Appellant WNET Br. at 12, 28, 43; Amicus
Br. of Paramount Pictures Corp. et al. at 29.  In general,
however, these "negotiated Internet retransmissions . . .
typically delay Internet broadcasts as not to disrupt plaintiffs'
broadcast distribution models, reduce the live broadcast
audience, or divert the live broadcast audience to the Internet."
*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012).

[6]    In *ASCAP*, we left open "the possibility . . . that a
transmission could constitute both a stream and a download."
*United States v. Am. Soc'y of Composers, Authors, Publishers*
(*ASCAP*), 627 F.3d 64, 74 n.10 (2d Cir. 2010).  While streaming
performances over the Internet constitutes a transmission "to the
public," *see ivi, Inc.*, 691 F.3d at 278-79; *ASCAP*, 627 F.3d at
74, allowing a consumer to download a copy so he can later play
it back for himself does not, *see ASCAP*, 627 F.3d at 73, 75;
*Cablevision*, 536 F.3d at 139.  To the extent that Aereo's system
immediately plays back from a copy that is still being recorded,

-24-

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 106-07,

111-12 (2d Cir. 1998) (holding that device allowing users to

access private phone line to listen to public radio

broadcasts infringed right of public performance, in the

absence of a defense, and was not fair use).

In *ivi*, we addressed the need for a preliminary

injunction to enjoin ivi from streaming copyrighted works

over the Internet without permission:

> Indeed, ivi's actions -- streaming
> copyrighted works without permission --
> would drastically change the industry, to
> plaintiffs' detriment. . . .  The absence
> of a preliminary injunction would
> encourage current and prospective
> retransmission rights holders, as well as
> other Internet services, to follow ivi's
> lead in retransmitting plaintiffs'
> copyrighted programming without their
> consent.  The strength of plaintiffs'
> negotiating platform and business model

---

it is clearly "both a stream and a download," *ASCAP*, 627 F.3d at
74 n.10, and at a minimum the streaming portion constitutes an
unlicensed public performance.  If 50,000 Aereo subscribers
choose to "Watch" the Super Bowl live, each subscriber receives a
"performance or display" of the exact same broadcast on a seven-
second delay, even if Aereo is also simultaneously creating a
unique copy for each subscriber so that each one has the option
to pause, rewind, or save the copy for later if they wish.  Until
the subscriber exercises that option, the existence of the copy
is irrelevant; the broadcast is streaming "live" to each user at
the same time just as it did in *ivi*.

would decline.  The quantity and quality
of efforts put into creating television
programming, retransmission and
advertising revenues, distribution models
and schedules -- all would be adversely
affected.  These harms would extend to
other copyright holders of television
programming.  Continued live
retransmissions of copyrighted television
programming over the Internet without
consent would thus threaten to
destabilize the entire industry.

691 F.3d at 286.  These concerns apply with equal force

here, where Aereo is doing precisely what ivi was enjoined

from doing:  streaming copyrighted works over the Internet

without permission of the copyright holders.  Today's

decision does not merely deny the broadcasters a licensing

fee for Aereo's activity; it provides a blueprint for others

to avoid the Copyright Act's licensing regime altogether.

*See* Appellant ABC, Inc. Br. at 10 (citing articles reporting

on the rise of copycat services).  Congress could not have

intended such a result.

### *CONCLUSION*

Based on the plain meaning of the statute, its

legislative history, and our precedent, I conclude that

Aereo's transmission of live public broadcasts over the
Internet to paying subscribers are unlicensed transmissions
"to the public."  Hence, these unlicensed transmissions
should be enjoined.  *Cablevision* does not require a
different result.   Accordingly, I dissent.